**FIRST UNITED PENTECOSTAL CHURCH OF BEAUMONT, d/b/a The Anchor of Beaumont, Petitioner,**

v.

**Leigh PARKER, Respondent**

No. 15-0708

Supreme Court of Texas.

Argued December 7, 2016

OPINION DELIVERED: March 17, 2017

Jocelyn A. Holland, Mcleod, Alexander, Powell & Apffel, Timothy A. Beeton, Simpson & Beeton, Galveston, TX, Wade B. Williams, Lewis & Williams, L.L.P., Houston, TX, for Petitioner.

Jamie D. Matuska, Matuska Law Firm, Nederland, TX, Jon B. Bumeister, Moore Landrey, LLP, Beaumont, TX, for Respondent.

Justice Johnson delivered the opinion of the Court.

This case involves the loss of over a million dollars that a church entrusted for safekeeping to The Lamb Law Firm, P.C. The firm deposited the money into its trust account. Less than two weeks later, $750,000 was transferred from the trust account to a new account opened and only accessible by the firm's owner, Kip Lamb. That transfer was just the beginning, and in shortly over a year the church's money was gone. When Leigh Parker, one of the firm attorneys representing the church, told the church that its money had been spent, the church sued the firm, Lamb, and Parker. The trial court granted summary judgment to Parker. The court of appeals affirmed. We affirm in part and reverse and remand in part.

## I. Background

In the fall of 2007, Lonnie Treadway, pastor and chief executive manager of the First Pentecostal Church of Beaumont, hired The Lamb Law Firm, P.C. to defend Treadway and the church in a sexual harassment lawsuit. The firm was a professional corporation owned by Kip Lamb. Parker worked for the firm on what he characterized as a contract basis, being paid a set monthly amount and receiving benefits paid for by the firm. Lamb and Parker participated on the firm's behalf in defending the church in the sexual harassment suit.

In April 2008, the church settled an insurance claim for property damage it sustained during Hurricane Rita. The church's part of the settlement was $1,094,611.02. Treadway was concerned that the settlement money would be targeted by plaintiffs in the sexual harassment suit. Pursuant to these concerns, Treadway and Lamb agreed that the firm would hold the money in an attempt to shield it from potential judgment creditors. The settlement funds were deposited in the firm's trust account on April 14, 2008. On April 25, 2008, $750,000 was electronically transferred out of the trust account into another account in Lamb's name. Ten days later Lamb initiated the transfer of another $150,000 out of the trust account. By the end of September 2009, approximately $1,200,000 had been transferred from the firm's trust account to either personal accounts of Lamb or the firm operating account. The money was spent either on Lamb's personal expenses or on firm expenses. Parker maintains he was unaware that the church's money had been transferred from the trust account until Lamb told him about it in the summer of 2010.

In July 2011, Parker attended a meeting with the church's Board of Trustees and reported that the firm still had the money. In October 2011, Jonathan Green, the church's new pastor, contacted Parker and told him the church needed the money. At that point Parker told Green that the money was gone, Lamb spent it, and there were no prospects that it could be repaid in the immediate future. The next day Parker sent the church a letter memorializing what he told Green. In his letter, Parker maintained that he did not know Lamb had withdrawn and spent the

church's money until the summer of 2010. But Parker stated that he breached his fiduciary duty by not disclosing that the funds were missing once he knew they were gone and by not investigating to find out what happened to the money. He explained that he had hoped a transaction he had been working on for the firm (the Ghana deal) would work out so the church could have been made whole. Parker also stated in the letter that he never had control of the church's funds, but he could have unknowingly and indirectly received some of the money in the form of his bi-monthly paychecks from the firm.

In February 2012, the church sued the firm, Lamb, and Parker. It alleged causes of action for theft and embezzlement, misapplication of funds by a fiduciary, breach of fiduciary duty, fraud, legal malpractice, conspiracy, and "other wrongful conduct." By then Lamb was facing criminal charges. He eventually pleaded guilty to misapplication of fiduciary property and fraud and was sentenced to fifteen years confinement.[1] This Court accepted his resignation as an attorney in lieu of disciplinary action, cancelled his law license and state bar card, and prohibited him from practicing law in the State of Texas. *In re Kip Kevin Lamb*, Misc. Docket No. 13-9056 (Tex. Apr. 29, 2013).

In support of its claims against Parker, the church alleged that he was associated with, or worked for, the firm; he was part of a joint venture with Lamb and the firm; Parker knowingly participated in Lamb's breach of fiduciary duty; Parker made intentional misrepresentations to the church to cover up the fact that the money was gone; and he was jointly and severally liable for the church's damages.

Parker filed no-evidence and traditional motions for summary judgment as to all the claims. The trial court scheduled a hearing on the motions for August 2012, but the church non-suited Parker before the hearing. Then, in October 2013, the church brought Parker back into the suit via supplemental petition. Parker re-filed his motions for summary judgment.

In his no-evidence motion, Parker argued that the church had not produced any evidence of causation between his actions and the church's damages. In support of the traditional motion, Parker attached his affidavit. In the affidavit, Parker averred that he was at all times a contract attorney for the firm, had no knowledge of Lamb's scheme until the summer of 2010, and did not control or receive any of the church's money. Parker also attached a copy of Lamb's reply to a criminal pre-sentencing investigation (PSI) report in which Lamb admitted he used the church's funds, but he considered them a loan. Finally, Parker attached bank records and deposit slips evidencing that Lamb had taken the church's money.

In its response, the church relied in part on Parker's 2011 letter and a sworn statement he had given to the church's attorneys. The church pointed to language in the letter and from Parker's sworn statement that it claimed evidenced Parker was part of a joint venture and that Parker's actions were causally related to the church's loss. Specifically, the church pointed to Parker's admission that he "had

---

1. After he was indicted, Lamb fled to Arkansas where he was captured a week later. Heather Nolan, *Beaumont Attorney Accused of Stealing Church Funds Extradited Home*, Beaumont Enterprise (May 10, 2012), http://www.beaumontenterprise.com/news/crime/article/Beaumont-attorney-accused-of- stealing-church-3550056.php. He pleaded guilty to misapplication of fiduciary property. *Beaumont Attorney Gets 15 Years for Trust Theft*, Beaumont Enterprise (April 8, 2013), http://www.beaumontenterprise.com/news/article/Beaumont-attorney-gets-15-years-for-trust-theft-4418766.php.

a duty to investigate and inform [the church] that their funds were no longer there," Parker's reference to "our firm," and his statement that "we had to pay back the church funds."

The trial court granted Parker's motions for summary judgment without specifying its reasons. The church appealed, challenging the court's rulings only with respect to the claims for breach of fiduciary duty, civil conspiracy, aiding and abetting, and joint venture.[2]

In a split decision, the court of appeals affirmed. ―― S.W.3d ―― (Tex. App.— Beaumont 2015). It focused primarily on the lack of causation between any of Parker's actions and the church's loss. The dissenting justice would have reversed as to the claims for breach of fiduciary duty and joint venture. *Id.* at ―― (Johnson, J., dissenting).

Here, the church argues that it did not need to provide evidence of causation in order to survive summary judgment on its breach of fiduciary duty claim. It also argues that the civil conspiracy and joint venture claims should survive because Parker's statements conflict, creating a fact issue regarding his knowledge that Lamb stole the money. Finally, the church argues that the appeals court misapplied the law on aiding and abetting and there is evidence Parker knowingly aided Lamb in stealing the money.

Parker argues that the church failed to preserve error as to the breach of fiduciary duty claim because evidence of causation is required unless an equitable remedy is sought, and the church did not argue in the courts below that it was seeking equitable remedies. Further, even if error was preserved as to the breach of fiduciary

duty claim, he argues that evidence of proximate cause of the church's damages was necessary to survive summary judgment, and the church did not present such evidence. As to joint venture, Parker argues that even if there were evidence of a joint venture to operate the law firm—which the church does not claim—there is no evidence either of a joint venture to steal the church's money or of causation or damages. Finally, Parker argues that in regard to the conspiracy and aiding and abetting claims, there is no evidence either of his knowledge that the church's money was going to be misappropriated or of his intent to aid the misappropriation, and to the contrary, the evidence is conclusive that he had neither such knowledge nor intent.

## II. Standard of Review

We review grants of summary judgment de novo. *Cantey Hanger, LLP v. Byrd*, 467 S.W.3d 477, 481 (Tex. 2015). In our review we take as true all evidence favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts in the non-movant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

When a party moves for both traditional and no-evidence summary judgments, we first consider the no-evidence motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the non-movant fails to meet its burden under the no-evidence motion, there is no need to address the challenge to the traditional motion as it necessarily fails. *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Thus, we first review each claim under the no-evidence standard. Any claims that survive the no-evidence review

---

**2.** At various points in its briefing submitted to both the court of appeals and this Court, the church references both joint enterprise and joint venture. During oral arguments in this Court, the church's counsel expressly disclaimed any claim for joint enterprise.

will then be reviewed under the traditional standard.

To defeat a no-evidence motion, the non-movant must produce evidence raising a genuine issue of material fact as to the challenged elements. *See Ridgway*, 135 S.W.3d at 600. A genuine issue of material fact exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)). The evidence does not create an issue of material fact if it is "so weak as to do no more than create a mere surmise or suspicion" that the fact exists. *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 875 (Tex. 2014) (quoting *Ridgway*, 135 S.W.3d at 601).

A party moving for traditional summary judgment meets its burden by proving that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c).

### III. Discussion

### A. Breach of Fiduciary Duty

Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *See, e.g., ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010); *see also Jones v. Blume*, 196 S.W.3d 440, 447 (Tex. App.—Dallas 2006, pet. denied). In this case, the court of appeals held that the church provided no evidence of causation because it did not establish that Parker's untimely disclosure rather than Lamb's theft of the funds caused its damages. —— S.W.3d at ——.

Referencing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, the church argues that proof of damages is not required

when the claim is that an attorney breached his fiduciary duty to a client; thus the client need not produce evidence that the breach caused actual damages. 138 Tex. 565, 160 S.W.2d 509, 514 (1942). We agree in part.

In *Kinzbach*, we held that the client was not required to prove damages when he established that a defendant breached a fiduciary duty and obtained a "secret gain or benefit." *Id.* In that case, Kinzbach's agent breached his duty of loyalty by engaging in self-dealing with a third party. *Id.* at 510. We held that equity required the agent to forfeit the secret commission from the third party and give it to Kinzbach, even absent evidence that Kinzbach was harmed by the agent's actions. *Id.* at 514. We reasoned that an agent should not escape liability for, and retain the profits from, breaching the duty of loyalty to a principal simply because the principal might not be able to prove that the breach caused damages. *Id.*

In *Burrow v. Arce*, we addressed a similar question in the context of an attorney-client relationship. 997 S.W.2d 229, 240 (Tex. 1999). In 1989, an explosion at a chemical plant killed several people and injured hundreds more. *Id.* at 232. A group of five attorneys represented 126 of the plaintiffs—almost half of whom would eventually sue the attorneys based on allegations that the attorneys grossly mismanaged settlement negotiations and unfairly distributed the settlement proceeds. *Id.* The plaintiffs sought to have the attorneys forfeit their fees. *Id.* We held that in the attorney-client context, "a client need not prove actual damages in order to obtain forfeiture of an attorney's fee for the attorney's breach of fiduciary duty to the client." *Id.*

In *Burrow*, we relied heavily on *Kinzbach* and various Restatement provi-

sions concerning agency and trusts. We cited the Restatement (Second) of Trusts, which provides that a court may reduce or deny the compensation of a trustee·who commits a breach of trust. *Id.* at 237 (citing RESTATEMENT (SECOND) OF TRUSTS § 243 (1959)). Additionally, we noted that the then-proposed Restatement (Third) of The Law Governing Lawyers provided, "A lawyer engaging in clear and serious violation of duty to a client may be required to forfeit some or all of the lawyer's compensation for the matter." *Id.* (quoting RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 49 (Proposed Final Draft No. 1, 1996)). The quoted language did not make it into the final version of the Restatement, but the proposition it expresses is rooted in broad principles of agency and the duties of trustees. We recognized then, and affirm today, that such a rule is founded on both principle and pragmatism, is sound, and applies in the attorney-client context in Texas.

■ First, in principle, a person in a trust relationship who does not provide the loyalty bargained for fails to fulfill his agreement and is not entitled to be paid in full. Therefore, when considering an appropriate remedy for a fiduciary's breach of loyalty, the "agent's breach of fiduciary duty should be deterred even when the principal is not damaged." *Id.* at 240. "It is the agent's disloyalty, not any resulting harm, that violates the fiduciary relationship and thus impairs the basis for compensation." *Id.* at 238. Pragmatically, fee forfeiture also serves as a deterrent. The central purpose of this remedy "is not to compensate an injured principal, even though it may have that effect." *Id.* "Rather, the central purpose of the equitable remedy of forfeiture is to protect relationships of trust by discouraging agents' disloyalty." *Id.*

The court of appeals determined that the church did not provide any evidence Parker's breach of fiduciary duty caused its damages—and the church does not argue that it did. But as the church points out, in *Kinzbach* evidence of causation was not necessary because the remedy sought was equitable forfeiture of an improper benefit received by the agent. 160 S.W.2d at 514. Likewise, in *Burrow* the remedy applied was equitable forfeiture of fees paid to attorneys who breached their fiduciary duties, not damages the clients suffered because of the attorneys' actions or omissions. *Burrow*, 997 S.W.2d at 239–40. In neither of those cases did we hold that a client need not prove that a breach of fiduciary duty caused actual damages if a client is claiming such damages. Plainly put, for the church to have defeated a no-evidence motion for summary judgment as to a claim for actual damages, the church must have provided evidence that Parker's actions were causally related to the loss of its money. It did not do so. On the other hand, the church was not required to show causation and actual damages as to any equitable remedies it sought.

■ Parker argues that the church waived its claim for equitable remedies by failing to raise it in the court of appeals. Specifically, he argues that the issue was waived because the words *equitable, forfeiture*, and *disgorgement* do not appear in the church's briefing at the court of appeals, even though in the trial court the church specified that it sought "disgorgement of all fees, financial benefits, profits, and any other remuneration derived from [Parker's] wrongful acts." Parker urges that the church only briefed the issue of actual damages caused by Parker's alleged breach of fiduciary duty.

■ We generally hesitate to turn away claims based on waiver or failure to preserve the issue. *See Nath v. Tex. Chil-*

*dren's Hosp.*, 446 S.W.3d 355, 365 (Tex. 2014). In considering assertions that claims have been waived, we have urged courts of appeals, and reminded ourselves, to construe briefing "reasonably, yet liberally, so that the right to appellate review is not lost by waiver." *Perry v. Cohen*, 272 S.W.3d 585, 587 (Tex. 2008). That standard is simply an explication of Texas Rule of Appellate Procedure 38.1(f), which requires courts to treat the statement of an issue "as covering every subsidiary question that is fairly included."

Parker is correct that the church failed to use the words *equitable, forfeiture*, or *disgorgement* in its briefing to the court of appeals. Yet, our review of the briefs leads us to conclude that the equitable remedies were subsidiary questions fairly included in the briefing there. *See* TEX. R. APP. P. 38.1(f). For example, one issue raised by the church was that the trial court erred in granting summary judgment on the breach of fiduciary duty claim because whether the church suffered actual damages was "beside the point," and it cited *Kinzbach* and *Burrow* in support of its argument. Parker seems to have recognized the subject matter of the church's arguments because one of the subheadings in his Reply Brief was entitled, "*Burrow* and other fee forfeiture cases are inapplicable to the present case." We conclude that the church did not waive the issue of whether it was entitled to equitable remedies.

In arguing that equitable remedies for breach of fiduciary duty do not apply here, Parker mainly seeks to factually distinguish this case from *Burrow* by pointing out that he was a contract attorney, urging that he did not directly profit from his relationship with the church, and arguing that the church failed to allege a factual basis for any fee forfeiture or disgorgement as to him. But Parker did not assert in his motion for summary judgment that

there was no evidence to support equitable remedies. Rather, he asserted that there was no evidence that any of his alleged breaches of fiduciary duty caused damages to the church. And in response, the church specifically argued that it did not need to present evidence of causation because it was entitled to equitable remedies regardless of whether Parker's breaches of fiduciary duty caused it damages.

We conclude that the court of appeals erred by determining that summary judgment for Parker was proper on the church's claim that it was entitled to equitable relief because Parker breached his fiduciary duty to the church.

### B. Civil Conspiracy

 An action for civil conspiracy has five elements: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action; (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result. *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005). An actionable civil conspiracy requires specific intent to agree to accomplish something unlawful or to accomplish something lawful by unlawful means. *Swinnea*, 318 S.W.3d at 881. This inherently requires a meeting of the minds on the object or course of action. *Id.* (quoting *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex. 1983)). Thus, an actionable civil conspiracy exists only as to those parties who are aware of the intended harm or proposed wrongful conduct at the outset of the combination or agreement. *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996); *see Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968).

In this case, the church's arguments allude to two possible conspiracies: an initial conspiracy to steal its money, and a subsequent conspiracy to cover up the theft. But as we explain below, the summary judgment record does not include evidence that creates a material fact question as to the existence of either possible conspiracy.

### 1. Conspiracy to Steal the Money

■ First, the church does not reference any evidence of a common plan between Parker and Lamb to steal the money. The church points to Parker's statements that during the summer of 2010 he knew "the funds had been used by us just through our operating stuff," and that, "my gosh, if we have actually spent that money, then we've got to get [the Ghana deal] closed." Further, the church argues that Parker admitted he may have received some of the misapplied Church funds as part of his bi-monthly compensation payments. But this evidence does not raise an issue of material fact with respect to the conspiracy claim. In *Triplex Communications, Inc. v. Riley*, we held that "civil conspiracy requires specific intent." 900 S.W.2d 716, 719 (Tex. 1995). "For a civil conspiracy to arise, the parties must be aware of the harm or wrongful conduct at the inception of the combination or agreement." *Id.* The referenced testimony is neither evidence of, nor does it support an inference that, Parker had a specific intent to steal the money at any time before the funds were gone.

Referencing *Randall v. Dallas Power & Light Co.*, the church urges that a genuine issue of material fact is created when two admissions or statements by the same party conflict. 752 S.W.2d 4, 5 (Tex. 1988); *see also Gaines v. Hamman*, 163 Tex. 618, 358 S.W.2d 557, 562 (Tex. 1962). It then urges that Lamb's response to the PSI report indicated that Parker forged several checks on the trust account in 2008 and 2009, which conflicts with the statements in Parker's affidavit to the effect that he had no access to the trust account.

We do not question the holdings of the cases the church cites, but they are inapposite here. Assuming the truth of the statements in Lamb's response to the PSI report that Parker signed Lamb's name on trust account checks without authority, nothing in the summary judgment record suggests that the checks were not made out to parties entitled to the money. Parker's signing of checks to pay clients, employees, and court fees—even if made without Lamb's authority—is consistent with Lamb's other statements in his response to the PSI report to the effect that Parker had no knowledge of any improper use of the church's funds. Furthermore, in the response to the PSI report, Lamb explained that when the firm received the church's money he immediately transferred most of the money to a special account to which Parker did not have access. Thus, Lamb's statements are not evidence that Parker was party to an agreement to steal the church's money or had a specific intent to do so. *See Schlumberger Well*, 435 S.W.2d at 857 (a party cannot be a co-conspirator without knowledge of the wrong intended to be committed). Nor is there other evidence in the record to support an inference that Parker was part of a plan or scheme to steal the church's money.

### 2. Conspiracy to Cover Up

■ The church urges that it was not required to provide evidence that Parker's failure to timely investigate and disclose the theft caused the church's damages—it simply points to Lamb's theft of the funds as evidence to support causation and damages. But that is not enough.

It is undisputed that after Parker learned in the summer of 2010 that the church's money was gone, he did not tell the church. Rather, he agreed with Lamb to try to replace the funds by means of "the Ghana deal." But even assuming that Parker's failure to immediately disclose that the money was gone was unlawful—even if it was done to "cover up" the fact that the money was missing—the church did not provide evidence that Parker's failure caused actual damages to the church. *Tri*, 162 S.W.3d at 556.

The actions of one member in a conspiracy might support a finding of liability as to all of the members. *See Ins. Co. of N. Am. v. Morris*, 981 S.W.2d 667, 675 (Tex. 1998). But even where a conspiracy is established, wrongful acts by one member of the conspiracy that occurred before the agreement creating the conspiracy do not simply carry forward, tack on to the conspiracy, and support liability for each member of the conspiracy as to the prior acts. *See Swinnea*, 318 S.W.3d at 881. Rather, for conspirators to have individual liability as a result of the conspiracy, the actions agreed to by the conspirators must cause the damages claimed. *Id.* Here the church does not reference evidence of a conspiracy between Parker and Lamb to take or spend the church's money. Rather, it points to evidence that once Parker learned that the church's money was gone, he was concerned—as he well should have been—and he agreed with Lamb to try to replace it. The evidence that Parker conspired with Lamb to cover up the fact that the money was missing and attempt to replace it was evidence that Parker tried to mitigate the church's loss, not that he conspired to cause it. The damage to the church had already been done when Parker and Lamb agreed to cover up the theft and try to replace the money.

We affirm the court of appeals' judgment regarding the civil conspiracy claim.

### C. Aiding and Abetting

We begin by noting that this Court has not expressly decided whether Texas recognizes a cause of action for aiding and abetting. *See Juhl v. Airington*, 936 S.W.2d 640, 643 (Tex. 1996). However, the parties do not raise or brief the question of whether such a cause of action exists in Texas, so we will assume, without deciding, that it does.

Even though the court of appeals addressed the church's aiding and abetting claim, Parker first asserts that the church waived the claim because it was not specifically pleaded in the trial court or addressed in the written response to Parker's motion for summary judgment. He is correct that the terms *aiding* and *abetting* are not in the church's petition or its response to Parker's motion for summary judgment. As Parker correctly notes, a claim or allegation may not be raised for the first time on appeal. *Stafford v. Stafford*, 726 S.W.2d 14, 15 (Tex. 1987). Further, "[i]ssues not expressly presented to the trial court by written motion, answer or other response shall not be considered on appeal as grounds for reversal" of a summary judgment. Tex. R. Civ. P. 166a(c).

The church claims it preserved this issue by urging in the facts section of its pleadings that Parker "knowingly" participated in Lamb's breach of fiduciary duty because Texas follows a fair-notice standard for pleading. Under that standard, courts consider whether the opposing party "can ascertain from the pleading the nature and basic issues of the controversy and what testimony will be relevant." *Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 896 (Tex. 2000). Stated somewhat differently, the fair-notice standard measures whether the pleadings

have provided the opposing party sufficient information to enable that party to prepare a defense or a response. *See Kopplow Dev., Inc. v. City of San Antonio*, 399 S.W.3d 532, 536 (Tex. 2013); *Roark v. Allen*, 633 S.W.2d 804, 810 (Tex. 1982). Claiming that Parker "knowingly" participated in Lamb's breach of fiduciary duty does not give Parker information sufficient to understand that the church was asserting a claim for aiding and abetting. This is especially true because several of the other claims the church asserted—*e.g.* civil conspiracy and joint venture—required proof of knowing participation. We agree with Parker that the church did not preserve a claim for aiding and abetting because its pleadings did not give him fair notice of it.

 Moreover, as noted above, although we have never expressly recognized a distinct aiding and abetting cause of action, the court of appeals determined that such a claim requires evidence that the defendant, with wrongful intent, substantially assisted and encouraged a tortfeasor in a wrongful act that harmed the plaintiff. —— S.W.3d at ——. Here the church references no evidence that Parker assisted or encouraged Lamb in stealing the church's money. In his response to the PSI report, Lamb disclaimed Parker's involvement, and Parker clearly and consistently disclaimed knowing that Lamb was taking the church's money from the firm's trust account until the summer of 2010 after the money was gone. While it is true that Parker helped Lamb cover up the theft, this cannot be the basis for a claim against Parker for aiding and abetting Lamb's prior theft or misapplication of the church's money when there is no evidence that Parker was aware of Lamb's plans or actions until after they had taken place. *See Juhl*, 936 S.W.2d at 644–45 (noting that courts should look to the nature of the wrongful act, kind and amount of assis-

tance, relation to the actor; defendant's presence while the wrongful act was committed, and defendant's state of mind (citing RESTATEMENT (SECOND) OF TORTS § 876 cmt. d (1977))). As we discussed above, Lamb spent all of the church's money before Parker became involved, and there is no evidence the church was harmed by the only wrongful act in which Parker assisted or encouraged Lamb—covering up the fact that Lamb had spent the church's money.

We affirm the judgment of the court of appeals as to the aiding and abetting claim.

## D. Joint Venture

 The church does not argue that Parker and Lamb were joint venturers in the practice of law, but only that they were joint venturers in misappropriating the church's money and then covering it up. The elements of a joint venture are (1) an express or implied agreement to engage in a joint venture, (2) a community of interest in the venture, (3) an agreement to share profits and losses from the enterprise, and (4) a mutual right of control or management of the enterprise. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 534–35 (Tex. 2002); *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 287 (Tex. 1978). Joint venture liability serves to make each party to the venture an agent of the other venturers and hold each venturer responsible for the wrongful acts of the others in pursuance of the venture. *See St. Joseph Hosp.*, 94 S.W.3d at 535.

The church mainly relies on Parker's sworn statement describing his legal relationship with Lamb as "joint venturers together." But evidence and statements must be considered in context. *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005) ("[E]vidence that might be 'some evidence' when considered in isolation is nevertheless rendered 'no evidence' when

contrary evidence shows it to be incompetent."). The "joint venturers" statement was made to describe the relationship between the professional corporations under which Lamb and Parker practiced:

Attorney: [Parker], you are a partner in this law firm?

Parker: No. We don't have a partnership agreement. I'm a PC, and Kip's a PC. And so if you want to call us probably the best legal relationship is joint venturers together.

Attorney: Do the two PCs form the Lamb Law Firm?

Parker: No, Lamb Law Firm is a d/b/a of Kip's PC.

Taken in context, Parker's quoted statement did no more than clarify that there was not a partnership agreement between Parker and Lamb. And viewing it in the light most favorable to the church, as we must, the statement is no evidence that Parker was a joint venturer with Lamb in stealing the church's money.

The church also points out that Parker referred to the firm variously as "our firm," "us," and "we've" during his sworn statement. But the church's claim here is only that there was a joint venture to withdraw the church's money from the firm's trust account and use it for purposes the church had not authorized. There is no evidence that Parker agreed with Lamb to either steal the church's money or share that money. The references—when viewed in the context of the other clear statements made by both Lamb and Parker—are not evidence that they were joint venturers in misappropriating the church's money.

The church also points to Lamb's statement in his response to the PSI report that Parker signed Lamb's name to several checks on the trust account and that Parker might have known the church's money was held in the firm's trust account. But as noted above, there is no evidence that these checks were not made out to persons entitled to the money. And even assuming Parker knew the church's money was deposited in the firm's trust account to begin with, there is no evidence that he knew of Lamb's having it transferred out of the trust account or that he agreed to participate in Lamb's actions.

Finally, the church points out that Parker's bi-monthly paychecks may have included some of the church's money. But even if they did, that does not comprise evidence that Parker had a mutual right to control and manage the stolen money, entered into a joint venture to steal the church's money, or had an agreement with Lamb to share profits and losses from the theft of the church's money.

To reiterate, taken in context and viewed in the light most favorable to the church, none of the evidence the church points to provides support for its claim that there was an express or implied agreement by Parker to be part of a joint venture with Lamb for the purpose of stealing the church's money. We affirm the judgment of the court of appeals with respect to the joint venture claims.

## IV. Conclusion

We affirm the judgment of the court of appeals on the church's claims for civil conspiracy, aiding and abetting, and joint venture. We reverse and remand to the trial court the church's claim that it is entitled to equitable remedies as to Parker for breach of fiduciary duties he owed to the church.