# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-19-00548-CV

**Byron Harper, Appellant**

**v.**

**PJC Air Conditioning and Plumbing, LLC
d/b/a Rabroker Air Conditioning & Plumbing, Appellee**

### FROM THE 169TH DISTRICT COURT OF BELL COUNTY
### NO. 296,781-C, THE HONORABLE GORDON G. ADAMS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellant Byron Harper sued his former employer, PJC Air Conditioning and Plumbing, LLC d/b/a Rabroker Air Conditioning & Plumbing, alleging that in September 2016, while employed as an HVAC technician, he began experiencing episodes of "physical symptoms such as nausea, dizziness, lethargy, and cold sweats." Harper said that he told Les Kelley, his supervisor and Rabroker's service manager, about the symptoms and eventually showed Kelley a video his wife had taken of him while he was experiencing his symptoms. The day after Kelley viewed the video, he terminated Harper's employment. Harper contended that although he was told that Rabroker had received numerous customer complaints about his work, the complaints were fabricated to provide a pretext for termination. He asserted that he had been diagnosed with a colloid cyst on the brain and that his condition substantially limited at least one major life

activity, that he "has a record of such impairment," or that he "was regarded as having an impairment by Rabroker." Harper alleged that Rabroker had discriminated against him on the basis of disability by firing him when he began showing symptoms of the cyst in an attempt to avoid "deal[ing] with his actual and/or perceived medical condition."

Rabroker filed a motion for traditional and no-evidence summary judgment. Rabroker asserted that there was no evidence of the following: (1) that Harper has an impairment that substantially limits at least one major life activity; (2) that he was a qualified individual under Chapter 21[1] (the Act) of the Labor Code, *see* Tex. Lab. Code §§ 21.001-.556; or (3) that he suffered an adverse employment action solely because of a disability. In seeking traditional summary judgment, Rabroker argued that Harper was not presently disabled, was not regarded as disabled when he was fired, and has no record of impairment. Rabroker also asserted that, as a matter of law, it had a legitimate, non-discriminatory reason for terminating Harper's employment and that Harper could not carry his burden of showing pretext.

To support its motion for traditional summary judgment, Rabroker provided Harper's deposition testimony and an affidavit by Les Kelley, along with receipts for work allegedly performed by Harper. In response, Harper provided his affidavit; his deposition testimony; deposition testimony by Les Kelley and Cody Kelley;[2] an affidavit by Pancho Chavez, a friend and former co-worker from earlier employment; Rabroker's Texas Workforce

---

[1] As the Texas Supreme Court explained, although courts often refer to Chapter 21 as the Texas Commission on Human Rights Act (TCHRA or CHRA), "the Commission on Human Rights has been replaced with the Texas Workforce Commission civil rights division." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 798 n.1 (Tex. 2010). Thus, the terms "TCHRA," "Chapter 21," and "the Act" are often used interchangeably in opinions applying the Act. *See id.*

[2] Cody Kelley is Les Kelley's son and a Rabroker employee who worked with Harper at Rabroker and at an earlier job. Les Kelley's daughter, Heather, was also employed by Rabroker as its service dispatcher.

Commission (TWC) documentation; the video he showed to Kelley; medical records from an October 10, 2016 emergency room visit; Rabroker's purported disciplinary documents; and a Center for Disease Control (CDC) report related to a firefighter who suffered from a similar condition. Rabroker objected to some of Harper's evidence, challenging Chavez's affidavit as containing hearsay; challenging Harper's "affidavit and/or portions" on grounds of hearsay or as insufficient because they were "conditioned on 'best of [his] recollection,'" were speculative, or lacked supporting expert evidence; and challenging the CDC report as hearsay and not properly authenticated. The trial court signed an order sustaining Rabroker's objections to Harper's evidence and granting summary judgment in favor of Rabroker. We reverse the trial court's order on summary judgment and remand the cause for further proceedings.

## STANDARD OF REVIEW

The Act "is modeled after federal law with the purpose of executing the policies set forth in" the Americans with Disabilities Act (ADA) and, thus, "federal case law may be cited as authority in cases relating to" Chapter 21, *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445-46 (Tex. 2004) (quoting *Green v. Industrial Specialty Contractors, Inc.*, 1 S.W.3d 126, 131 (Tex. App.—Houston [1st Dist.] 1999, no pet.)); *see City of Houston v. Proler*, 437 S.W.3d 529, 532 n.7 (Tex. 2014) ("Proler sued under the federal Americans with Disabilities Act (ADA) and under chapter 21 of the Texas Labor Code. In construing Texas law on this subject, we consider federal civil rights law as well as our own caselaw."); *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 804 (Tex. 2010) (Texas courts "look to analogous federal law in applying" state Act). The ADA and the Act are "designed to remove barriers which prevent qualified individuals with disabilities from enjoying employment opportunities available to

3

persons without disabilities." *Williams v. Tarrant Cnty. Coll. Dist.*, 717 F. App'x 440, 446 (5th Cir. 2018) (quoting *Seaman v. CSPH, Inc.*, 179 F.3d 297, 300 (5th Cir. 1999)). An employer violates the Act if it terminates an employee based on his disability, Tex. Lab. Code § 21.051(1), which is defined as "a mental or physical impairment that substantially limits at least one major life activity of that individual, a record of such an impairment, or being regarded as having such an impairment," *id*. § 21.002(6); *see* 42 U.S.C. § 12102(1) (defining "disability" similarly). "Disability" "includes an impairment that is episodic or in remission that substantially limits a major life activity when active." Tex. Lab. Code § 21.0021(a)(1); *see* 42 U.S.C. § 12102(4)(D).

In 2008, after a series of cases that narrowed the ADA's scope of protection, Congress amended the ADA to clarify its scope, broadening its provisions and commanding courts "to construe disability broadly, 'to the maximum extent permitted by the terms of'" the ADA. *Williams*, 717 F. App'x at 447 (quoting 42 U.S.C. § 12102(4)(A)). The Act was amended similarly to provide that "disability" "shall be construed in favor of broad coverage . . . to the maximum extent allowed . . . ." Tex. Lab. Code § 21.0021(a)(1). As relevant here, a plaintiff can seek to establish that he suffers from a disability under one of two standards of disability—actual and regarded-as. *Williams*, 717 F. App'x at 446; *see* Tex. Lab. Code § 21.002(6). "[N]o matter which disability standard(s) plaintiff uses to seek protection under the ADA—actual or regarded-as—courts are commanded to construe disability broadly, 'to the maximum extent permitted by the terms of [the Act].'" *Williams*, 717 F. App'x at 447 (quoting 42 U.S.C. § 12102(4)(A)); *see* Tex. Lab. Code § 21.0021(a)(1).

4

Under the actual-disability standard, the plaintiff must show "a physical or mental impairment that substantially limits one or more major life activity."[3]  Tex. Lab. Code § 21.002(6); *see Williams*, 717 F. App'x at 446.  The phrase "substantially limits" "is not meant to be a demanding standard," and the plaintiff must only show that his impairment substantially limits his ability "to perform a major life activity as compared to most people in the general population."  *Williams*, 717 F. App'x at 446 (quoting 29 C.F.R. § 1630.2(j)(1)); *see Cannon v. Jacobs Field Servs. N. Am., Inc.*, 813 F.3d 586, 590–92 (5th Cir. 2016) ("The inquiry in this post-amendment case is thus whether Cannon's impairment substantially limits his ability 'to perform a major life activity as compared to most people in the general population.'" (quoting 29 C.F.R. § 1630.2(j)(1)(ii))).  "This comparison 'usually will not require scientific, medical, or statistical analysis.'"  *Williams*, 717 F. App'x at 446-47 (quoting 29 C.F.R. § 1630.2(j)(1)(v)).

Under the regarded-as standard, the plaintiff must show he was subjected to a prohibited employment action "because of an actual or perceived physical or mental impairment, other than an impairment that is minor and is expected to last or actually lasts less than six months, regardless of whether the impairment limits or is perceived to limit a major life activity."  Tex. Lab. Code § 21.002(12-a); *see Williams*, 717 F. App'x at 447.  The plaintiff need not show that the impairment substantially limited a major life activity, only that his employer "perceived [him] as having an impairment and that it discriminated against [him] on that basis."  *Williams*, 717 F. App'x at 447 (quoting *Adair v. City of Muskogee*, 823 F.3d 1297, 1306 (10th Cir. 2016); *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 230 (5th Cir. 2015)).

---

[3] "'Major life activity' includes, but is not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." Tex. Lab. Code § 21.002(11-a).

In the context of summary judgment in an employment-discrimination case, we apply a burden-shifting analysis in which the plaintiff has the initial burden to present a prima facie case of discrimination. *Avila v. United Parcel Serv., Inc.*, No. 03-18-00233-CV, 2018 WL 4100854, at *4 (Tex. App.—Austin Aug. 29, 2018, pet. denied) (mem. op.) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)); *see Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 781-82 (Tex. 2018) (*McDonnell Douglas* burden-shifting analysis applies to discrimination claims under Act). To make a prima facie case of disability discrimination, the plaintiff must establish that: (1) he has a disability or was regarded as disabled; (2) he was qualified for the job; and (3) he was subjected to an adverse employment decision on account of his disability. *Avila*, 2018 WL 4100854, at *5; *Carter v. Hegar*, No. 03-16-00706-CV, 2018 WL 2375815, at *3 (Tex. App.—Austin May 25, 2018, no pet.) (mem. op.); *Donaldson v. Texas Dep't of Aging & Disability Servs.*, 495 S.W.3d 421, 436 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see Cannon*, 813 F.3d at 590 (prima facie case under ADA). If the plaintiff meets that burden, the employer must articulate a legitimate, nondiscriminatory reason for its employment action, at which point the plaintiff then must raise a fact issue as to whether the explanation is merely pretextual and whether the employer instead engaged in intentional discrimination. *Avila*, 2018 WL 4100854, at *4; *see Cannon*, 813 F.3d at 590. "At the summary judgment stage, the nonmovant employee need only point to the existence of a genuine issue of material fact." *Avila*, 2018 WL 4100854, at *4.

We review the trial court's granting of summary judgment de novo, taking as true all evidence favorable to the non-movant, indulging every reasonable inference in his favor, and resolving any doubts in his favor. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017). When a party moves for both traditional and no-evidence

6

summary judgment, we first determine whether the non-movant produced evidence raising a genuine issue of material fact as to the challenged elements and then review any claims that survive the no-evidence review, asking whether the movant proved that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 220 (citing Tex. R. Civ. P. 166a(c)). "A genuine issue of material fact exists if the evidence 'rises to a level that would enable reasonable and fair-minded people to differ in their conclusions,'" and the evidence must do more than create a mere surmise or suspicion of the fact. *Id.* (quoting *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)).

### DISCUSSION

Harper argues that the trial court improperly sustained Rabroker's evidentiary objections and that in granting Rabroker's motion for summary judgment, it applied outdated standards in evaluating whether his summary-judgment evidence raised a genuine issue of material fact as to whether he met the actual-disability or regarded-as standards. In response to Rabroker's motion for traditional and no-evidence summary judgment, which put forth Les Kelley's affidavit and Harper's deposition testimony, Harper proffered his own affidavit, transcripts from the depositions of Les Kelley and Cody Kelley, Pancho Chavez's affidavit, Rabroker's TWC documentation, the video of one of Harper's episodes, his emergency-room medical records, documents from Harper's employment file, and a CDC report about colloidal cysts. Rabroker objected to portions of Harper's affidavit, most of Chavez's affidavit, and the CDC report. Even if we assume that the objections were properly sustained and disregard the challenged evidence, we conclude that Harper raised a material issue of fact. We therefore will summarize only the evidence to which there was no objection.

7

In his affidavit, Les Kelley averred that Harper was hired as a service technician in August 2016 and that in September 2016, during Harper's probationary period, the company received several complaints that Harper had been rude or had "oversold" unnecessary equipment. As a result, Rabroker made several refunds. Kelley asserted that although he spoke to Harper about the complaints on September 13 and asked him to "resolve these issues in future customer interactions," the complaints continued. On September 28, Harper showed Kelley a video "of what [Harper] described as him experiencing 'an episode,'" and Kelley averred that he "did not know what to make of the video, whether [Harper] was medicated, inebriated, had the flu or something of that nature, but this was [Kelley's] impression from the video." Harper did not make Kelley aware of any health problems, and Kelley claimed that he did not regard Harper as disabled before or after viewing the video. Kelley stated that he terminated Harper on September 29, after a customer came into the office "very upset about Mr. Harper's work at her home. She angrily berated me for it and other Rabroker staff over this issue." Kelley averred that Harper came to work "every day without issue, and he never requested time off for illness. But for Mr. Harper's continued customer complaints, he would not have been terminated." Attached to Kelley's affidavit were copies of twenty-nine service receipts for work he stated was performed by Harper between August 11 and September 27, 2016. Each of the receipts includes a note that the customer was unhappy with Harper's work—many stated that the customer had complained that Harper was rude, "[j]ust wanted to sell equipment," or "did not know what he was doing"; some stated the customer was "very upset"; and several stated that the customer had threatened never to use Rabroker again. Several receipts state that Rabroker reduced or refunded the customer's payments.

8

In his deposition, Kelley testified that he and his daughter, Rabroker's service dispatcher, oversaw customer service and scheduling. Kelley testified about customer complaints in general, saying, "Most complaints are they were charged more time than what the tech was there. I deal with that without the tech even knowing that call come in because it's just the customer—a lot of them wanting to get out of paying so much money." Kelley generally would not inform an employee about a complaint unless "it gets to where the customer is really upset." He further said that if Rabroker had to make a refund or there were "multiple complaints on a technician," he would speak to a technician to get the employee's "side of the story," to maintain customer satisfaction, and to allow the technician to correct their behavior.

Kelley testified that Rabroker received the first complaints about Harper two or three weeks after Harper was hired in early August 2016. Kelley testified that on September 13, he gave Harper an oral warning about "multiple complaints against him as far as his being able to repair units properly and complaints that he just wanted to sell equipment instead of repairing" and asked if there was "an issue or anything going on." Harper "did not respond" or "ask for any specific names, nothing." Kelley was asked about an Employee Disciplinary Document provided to TWC, which was dated September 12 and stated that Harper had received an oral warning that day. Kelley testified that he had simply misdated the form, explaining:

> This form here, the original form was created on the 13th. It was in his employee file [in the Waco office]. I don't know the exact date when TWC wanted this. Instead of calling the Waco office and getting it, I went off my memory and filled this out for them. I had the original. You should have that also, maybe you don't. But that's what happened on this here.

Kelley said that another form dated September 13 was the "contemporaneous document" he filled out the day he gave Harper his verbal warning and that the September 12 form was

9

"something that [he] put together to give to the TWC later." Kelley testified similarly about two disciplinary forms, both of which document Harper's termination—one says Harper "had no improvements from when we talked on 9-12-16. Still had upset customers calling and call backs," and the other says Harper "had no improvements from when I talked to him on 9-13-16. I had very upset customers calling and coming into office complaining." Kelley explained that the document referencing September 13 was the original, contained in Harper's employee file, and that the document referencing September 12 was prepared in response to the TWC inquiry because Kelley "did not have [Harper's] employee file" on hand.

Kelley testified about the invoices Rabroker proffered to show Harper's poor performance—invoices that were both provided to TWC and attached to Kelley's affidavit—all of which had a printed-out cover note attached to them asserting "word for word" the same complaint, that Harper was "very rude and was only interested in selling them new AC equipment." Kelley stated that he created those notes each time a customer called in a complaint, usually somewhere between one and three weeks after the service appointment had occurred. However, he then said that "[t]his was prepared for TWC," that the notes were typed up on Rabroker letterhead in response to Harper's TWC complaint, and that he did not remember whether he had just printed the same document multiple times and attached it to multiple invoices. Kelley also testified that Harper had shown him a video "of him in bed. He was sweating." Kelley did not recall whether Harper's speech was slurred, whether he was moaning, or whether he looked sick, nor did he recall how he responded or whether he said, "Wow, that looks like serious stuff." Kelley said he "wasn't sure" why Harper showed him the video and denied that Harper had said "he was afraid he had something wrong with his brain because his dad had had something wrong with his brain." Kelley said that Harper had never told him he

10

was having health problems "previous to the video." When asked, "What about after the video," Kelley responded, "No, not that I'm aware of. I don't remember."

In Harper's deposition, he stated that he was hired by Rabroker in August 2016 with a sixty-day probationary period and was fired just before the end of that period. He testified that he was not aware of any customer complaints about him, denied that Kelley had ever given him an oral warning or counseled him about any complaints, and asserted that documents purporting to show that Kelley had given him an oral warning in mid-September were false. Harper also testified that several of the invoices provided to him in the deposition—invoices that included notes about customer complaints—were inaccurate, had been falsified, or were not invoices for his work at all.

Harper stated that he had his first "episode" of symptoms in mid-September, two or three weeks before he was terminated; that he was worried about them; and that he spoke to Kelley about his symptoms "multiple" times, probably every other day:

> The conversation would be at first it was, you know, I'm kind of "Hey," what's going on with me, telling him "Hey, I don't know what this is, but this is how I'm feeling," you know. And he would seem concerned, you know, "Hey, let me know how you're feeling, and can you hold up today?" and all of that, just that general thing, you know. And as it progressed it got worse.

Harper said his symptoms included nausea, dizziness, lightheadedness, forgetfulness, slurred speech, and confusion, adding, "I mean I've had dizzy spells, but nothing like this. I've had symptoms, but nothing like this, never like what happened at this time in my life." Harper's job required him to work in attics in the summer, but he said he had never had trouble with the heat "other than the usual," explaining, "I mean you can only be up there so long." Harper testified that he and his wife, who is a nurse, discussed his symptoms and at first

11

thought they were caused by blood-sugar problems. However, after they ruled out that cause with testing at home, his wife suggested he "might have something wrong neurologically." Harper shared that concern with Kelley, testifying that they talked "about the possibilities of it being neurological" and "had conversations about hurrying up to get me insurance."

On September 28, 2016, Harper showed Kelley the video taken by his wife. Harper testified that because he had already told Kelley about his symptoms, the video "wasn't a surprise," and that Kelley's response to the video was, "Wow, that's . . . that's pretty serious." Harper further testified that they "went straight to HR and [Kelley] said 'Hey, let's be sure we get everything in order so that on the 1st he has insurance . . . so we can go get him looked at.'" Harper thought he and Kelley were "really great friends." However, the day after Harper showed him the video, Kelley fired Harper. Harper testified that Kelley "would not tell me why, other than I had too many customer complaints." Kelley did not tell Harper that someone had called that morning to complain, "would give [Harper] no details," and "wouldn't tell [him] what customer" or "what the complaint was." Harper said, "I even asked him specifically, I said 'Les, if I have these complaints, at least tell me what they are so at my next job I don't make the same mistake,' and he would never tell me anything. And when that happened, I felt betrayed."

Harper denied seeing the Employee Disciplinary Documents proffered by Rabroker in response to Harper's complaint filed with TWC. The first form stated Harper was given a verbal warning about customer complaints on September 12, but Harper testified that he was off work that day and could not have been counseled as alleged. Harper also denied receiving a verbal warning from Rabroker at any time and testified that he was not aware of any complaints related to his work, other than "one situation where it was a misunderstanding about warranty on equipment for a commercial customer, and that ended up being poor documentation

12

on the sales guy's part at Rabroker. And that conversation pertained to 'Let's figure out what happened here,' not so much a customer complaint." Shown the invoices purporting to show numerous complaints about him, Harper said that the majority were invoices for his work but that "there are a couple in here that are falsified. It is not my signature, not my initials." Harper also disputed many of the notes about customer complaints, which were added by Kelley or other employees, saying he was never told about any complaints. He asked, "If almost every single customer called and said I was rude, why was I never informed of it?" He noted that many of the invoices had the same "very generic" cover-letters attached, observing, "Every one of them the customer said, 'Byron was rude,' every one of them."

Harper testified that after his termination, he ran into a friend named Pancho Chavez, who "told me why Les fired me" and said, "Hey, man, what's going on with your brain? What's up with your brain? I heard you had something wrong with your brain." During the deposition, Rabroker's attorney provided Harper a copy of an affidavit prepared by Chavez and asked, "I want to know if there's anything that you recall that Mr. Chavez told you that had anything to do with your termination, your work at Rabroker, or your health condition that is not reflected in that affidavit?" Harper said, "Not that I can see. [Chavez] just told me what Cody [Kelley] said" about Harper's condition. Rabroker asked if Chavez had said anything about Harper's condition or termination "beyond what he wrote in that affidavit," and Harper answered, "[Chavez] says that Cody said 'he had something on his brain. It was causing him to black out,' and 'they were concerned,' 'they' as in Les and Rabroker."

On October 10, 2016, Harper said, he finally went to an emergency room, where he was diagnosed with a colloid cyst on his brain, prescribed medication for nausea, and given a follow-up appointment with a neurologist, which he canceled because he did not have insurance.

13

Asked whether he told Kelley that he had a colloid cyst, Harper replied, "I did not know I had a cyst at the time. All I had was the symptoms of the cyst." Although Harper did not know his diagnosis at the time he was fired, he testified, "I knew I had a serious medical condition." Harper also said that despite his symptoms, he never missed work, he was always able to do his work for Rabroker, and Kelley never had to make accommodations for him. Harper testified that he had his first episode of severe symptoms in mid-September 2016 and that those episodes continued through "the first part of 2017." Asked if that meant January or February 2017, Harper answered, "I can't say. I mean I don't recall what time of year it was. I just know they did carry on for a while." By the time of his deposition, he had medical insurance, but he had not gone to a neurologist or other doctor because "[i]t had been so long, and I have not had any of the episodes since."

In the portions of his affidavit to which Rabroker did not object, Harper said his symptoms included "dizziness, lightheadedness, nausea, cold sweats, confusion, [and] headaches." He said that his "symptoms are episodic" and that when they are "active and severe, they substantially limit my ability to carry on major life activities including, but not limited to, speaking, reading, concentrating, thinking, communicating, and interacting with others." He also described the video he showed to Kelley, saying, "In the video, I am experiencing cold sweats, appearing in a very confused state, and having slow and slurred speech."

Harper's medical records from the October 10, 2016 emergency-room visit state that he presented "with episodes of cold sweats, dizziness, lightheadedness, shakiness, visual changes, irritability, forgetfulness, confusion, 'poison aftertaste' to all foods, slurred speech (difficult to understand), fatigue, and pale skin, which began around September 17." Harper did "not have symptoms at this time" but stated that "the frequency of his episodes can range from

14

none to 2 times daily" and that he was "concerned that he has a brain tumor similar to his father." A CT scan showed a "[h]yperdense mass" that "probably represents a colloid cyst," which "may enlarge acutely and result [in] hydrocephalus and sudden death." Harper was informed of the scan results, prescribed an anti-nausea medication, and advised to follow up with a neurologist.

Cody Kelley testified in his deposition that he never saw Harper be rude to customers or try to sell unnecessary parts and never heard about any such complaints from his sister or father. Cody said that he had not heard that Harper might have a medical condition and that he was never told why Harper had been fired. Asked about Chavez's allegations, Cody testified that Chavez is not "the most honest service tech out there" and denied that he had told Chavez that Harper "had something on his brain" that was causing him to black out.

Rabroker's documents submitted to TWC consist of a letter by Rabroker's human resources officer that states the company's view of Harper's performance and termination and states that neither Kelley nor the HR officer had been aware that Harper had any medical conditions; its employee handbook; and copies of numerous invoices it said were of Harper's work, all with printed cover letters stating the customer's complaint—seven or eight also state that the payments were refunded or the customers' accounts were credited; a letter from Kelley summarizing Harper's hours and denying knowledge of a medical condition; an Employee Disciplinary Document that states that Harper received a verbal warning on September 12; and a second Employee Disciplinary Document that states he was fired on September 29 and refers to the September 12 verbal warning. Harper's employment documents consist of his leave form from September 12, the same two disciplinary documents provided to TWC referencing September 12, and two other Employee Disciplinary Documents that also purport to document Harper's verbal warning and later firing but state that the warning occurred on September 13.

15

This record contains evidence about Harper's symptoms, their episodic severity, and their interference with his ability to conduct major life activities, such as speaking, concentrating, thinking, and communicating. Harper also testified that he was diagnosed with a colloid cyst about two weeks after he was fired, and his medical records confirm that diagnosis, note his symptoms and their episodic nature, and state that a colloid cyst can result in sudden death. The record further contains Harper's testimony that he discussed his symptoms with Les Kelley, who Harper considered to be a friend; that he showed Kelley the video of him in the throes of an episode; that Kelley responded that it looked "pretty serious"; and that Harper was terminated the next day. Harper disputed the reason provided by Rabroker and the accuracy and veracity of Rabroker's documentation of the alleged customer complaints. He also testified that he was never given a verbal warning or told about any complaints. Finally, although the trial court struck Chavez's affidavit, Rabroker questioned Harper about the affidavit during his deposition, which was proffered by Rabroker as summary-judgment evidence, and so the record includes Harper's testimony that Chavez told him that Cody Kelley had said the company was worried that Harper had "something on his brain" that was "causing him to black out."

The summary-judgment record contains evidence of Harper's symptoms, their interference with his ability to conduct major life activities, his diagnosis, and the possible severe consequences of the diagnosis. *See Williams*, 717 F. App'x at 447-48. It also contains evidence that Harper made his symptoms known to Kelley, as well as his fear that there was a neurological cause. "In the light of the relatively low bar created by the substantially-limits and summary-judgment standards," Harper's evidence creates genuine issues of material fact as to whether his impairment was substantially limiting and whether Rabroker was aware of his impairment. *See id.* at 448-49.

16

As for his regarded-as claim, Harper was not required to establish that Rabroker believed his impairment was substantially limiting—only that the company knew of his impairment or erroneously perceived one. *See Cannon*, 813 F.3d at 591-92; *Williams*, 717 F. App'x at 449. Although Rabroker insists that Harper's deposition testimony established that his episodes lasted for less than six months, Harper said that he was uncertain when his severe episodes stopped and could only be sure that they went from September 2016 through the "first part" of 2017, which could be any point between January and June 2017—his testimony does not establish that his symptoms ended in January or February as Rabroker insists. Furthermore, the definition of "regarded as having such an impairment" requires only that Harper show that he was terminated because of Rabroker's *perception* that he suffered from an impairment that was expected to last *or* actually lasted more than six months. *See* Tex. Lab. Code § 21.002(12-a). Whether Harper's symptoms actually lasted more than six months is less important than whether the parties *expected them to last* longer than six months.

Finally, there is evidence that Harper was not counseled or told about any customer complaints, that Rabroker's documentation of its alleged reason for termination was inaccurate or even falsified, and that Rabroker was concerned about Harper's medical condition. Although Rabroker proffered evidence contrary to Harper's version of events, the evidence must be viewed in the proper light—taking as true all evidence favorable to Harper, indulging every reasonable inference in his favor, and resolving any doubts in his favor. *See Parker*, 514 S.W.3d at 219. Viewed in that light, there was evidence sufficient to raise a genuine issue of material fact as to whether Rabroker's asserted reason for firing Harper was mere pretext.

17

## CONCLUSION

We hold that Harper provided summary-judgment evidence sufficient to create a genuine issue of material fact as to whether he is disabled under the actual-disability and regarded-as standards and whether Rabroker discriminated against him on that basis. *See Williams*, 717 F. App'x at 447-49. The trial court thus erred in granting summary judgment in favor of Rabroker. We reverse the trial court's order granting summary judgment in favor of Rabroker and remand the cause for further proceedings.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Baker and Triana

Reversed and Remanded

Filed: May 26, 2021