**Affirmed and Majority Memorandum Opinion filed October 31, 2024.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-22-00756-CV

---

**STANLEY COLE, Appellant**

**V.**

**EXXON MOBIL CORPORATION, Appellee**

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Cause No. 2018-56144**

---

## MAJORITY MEMORANDUM OPINION

Appellant Stanley Cole appeals the trial court's grant of summary judgment in favor of Appellee Exxon Mobil Corporation, contending the trial court (1) lacked jurisdiction to rule on Exxon's summary judgment motion; (2) erred in excluding Cole's causation evidence; and (3) erred in granting Exxon's summary judgment motion. We affirm.

BACKGROUND

Cole worked as an abrasive blaster for contractor Prokar for seven years starting in 1998 at Exxon's facility in Beaumont. He worked four days a week blasting railroad cars. When Cole saw his family doctor in 2014, she ordered an x-ray and sent him to pulmonologist Dr. Bencowitz, who diagnosed Cole with idiopathic pulmonary fibrosis ("IDF") and stated that Cole probably has silicosis. Cole continued to see Dr. Bencowitz's physician assistant. In early April 2018, Cole went to Dr. Haber for a second opinion, and Dr. Haber remained Cole's treating pulmonologist. Dr. Haber's "initial diagnosis on April 3rd, 2018, was diffuse pulmonary fibrosis with restrictive defect and with significant history of prior silica exposures as a sandblaster." A few weeks later, Dr. Haber "suspected chronic complicated silicosis with early PMF (progressive massive fibrosis) and significant pulmonary impairment."

On June 22, 2018, Cole filed suit in a Jefferson County district court against Exxon and several other companies who are not parties to this appeal.[1] He asserted a premises liability claim against Exxon. He alleged "evidence will show that allowing abrasive blasting operations to be conducted by operators using abrasive containing silica sand, EXXON MOBIL allowed an intrinsically unsafe and ultrahazardous activity to be conducted without regard to the safety and well-being of those individuals on its premises"; and (2) "allowing such an ultrahazardous activity contradicted and violated previous policies of EXXON MOBIL to prohibit use of silica sand in abrasive blasting operations."

In August 2018, the case was "transferred by the Multidistrict Litigation Panel (the MDL Panel) as a tag-along case to Judge Mark Davidson of the 333rd

---

[1] Cole also sued Clemco Industries Corporation, Empire Abrasive Equipment Company, L.P., The Quikrete Companies, LLC, Specialty Sand Company, and 3M Company.

Judicial District Court of Harris County pursuant to Rule 13 of the Texas Rules of Judicial Administration and Section 90.010(b) of the Texas Civil Practice and Remedies Code."

In his March 2019 deposition, Cole testified that he had used only sand to perform his blasting work. Later in November 2019, Prokar's owner Leroy Shreve testified in his deposition that his company did not use sand as the abrasive for blasting during Cole's employment; instead, his company bought a silica-free abrasive called olivine. Nonetheless, Shreve acknowledged that there is a "possibility that sand could have been purchased on occasion for blasting from the period of 1998 to 2005."

Cole filed his second amended petition in March 2021, and Exxon filed a motion for summary judgment on Cole's premises liability claim on February 10, 2022, which the trial court denied a few weeks later. On February 11, 2022, Cole filed his third amended petition, alleging in his facts section that he blasted the interior and exterior of railcars "using silica sand and olivine abrasive" and that "the debilitating effect of silicosis, interstitial fibrosis caused by exposure to olivine dust, and pulmonary massive fibrosis on [him] makes this action necessary." Regarding Exxon, Cole asserted a premises liability claim and an assumption of duty claim.

On April 14, 2022, Exxon filed "Objections to Causation Evidence and Motion for Summary Judgment" in which it objected to the causation testimony of Cole's pulmonologist Dr. Haber and Cole's industrial hygiene and professional safety expert Frank Parker on grounds that the evidence is unreliable pursuant to *Havner* and *Robinson*.[2] Two weeks later, Cole filed a response. On May 4, 2022,

---

[2] *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997); *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549 (Tex. 1995).

3

Exxon filed a reply and, a day later, Cole filed a sur-reply.

On May 6, 2022, the trial court held a hearing on Exxon's motion. Exxon argued that because Cole has no reliable expert evidence establishing that olivine caused his lung disease, the trial court should grant Exxon's motion. During Cole's argument, the trial court questioned whether it has jurisdiction based on how Texas Civil Practice and Remedies Code section 90.001(27) defines silica and stated: "I am denying the summary judgment without prejudice for want of jurisdiction and remanding this case effective now to the 58th District Court of Jefferson County." In response, Exxon argued that, based on Cole's live pleading (his third amended petition) and the evidence, the trial court has jurisdiction over the case. Exxon pointed out that this is a silica case, albeit not a good one, because Cole pleaded he blasted with silica and testified he blasted with sand. When asked by the trial court if his "pleadings still allege silica," Cole acknowledged he pleaded that he blasted with silica and olivine. Thereupon, the trial court stated that it was persuaded it has jurisdiction over the case and granted Exxon's motion.

Following the hearing, the trial court signed an order sustaining Exxon's objections to causation evidence and granting Exxon's motion for summary judgment. The order stated that (1) Exxon is awarded final summary judgment as to all of Cole's causes of action; (2) Cole takes nothing against Exxon; and (3) this is a final judgment finally disposing of all parties and claims and is appealable. When the court signed the order, all defendants had been nonsuited or dismissed except for Clemco. Later that day, Cole also filed a fourth amended petition without seeking leave from the trial court. The claims asserted therein remained the same, but Cole deleted all references to silica.

On May 9, 2022, Cole filed a "Motion to Remand and to Vacate any Order Entered on May 6, 2022 and Plaintiff's Plea to the Jurisdiction" asserting the trial

court (1) "incorrectly assumed jurisdiction without considering the evidentiary record"; and (2) lost jurisdiction when he "amended his petition to remove any references to silica." Exxon filed a response to Cole's motion. The trial court held a hearing on Cole's motion on May 13, 2022, and denied the motion at the conclusion of the hearing.

On May 16, 2022, Cole filed a motion to remand requesting that the court remand the case to the 58th district court for further proceedings because the "active pleading filed in this case does not allege silica exposure." Exxon filed a response claiming that (1) a plaintiff cannot defeat an adverse summary judgment ruling by amending his pleading; (2) Texas Rule of Civil Procedure 63 required Cole to seek leave to amend his pleading; and (3) Cole's fourth amended petition is a nullity. Cole filed a reply, in which he (1) argued the summary judgment order erroneously stated that the judgment finally disposes of all parties and claims and is appealable because the order only disposed of Cole's claims against Exxon but did not dispose of Cole's claims against Clemco and Clemco remained a party in the case; and (2) requested the trial court modify its summary judgment order to "clarify that the judgment does not dispose of all parties."

On May 20, 2022, the trial court held a hearing on Cole's motion and denied the motion to remand. Cole asked the court to sign an amended order nunc pro tunc deleting the language contained in the May 6, 2022 order that the judgment disposes of all parties and claims and is appealable. Exxon agreed that the trial court should sign an amended order and the court stated: "[t]hen I will sign it this morning." That same day, the court signed an amended summary judgment order sustaining Exxon's objections to causation evidence, granting Exxon's motion for summary judgement, and stating that Cole takes nothing against Exxon.

On October 5, 2022, the trial court signed an order granting Cole's motion to

5

dismiss Clemco with prejudice constituting a final judgment in the case.[3] Cole filed a timely notice of appeal on October 19, 2022.

## ANALYSIS

## I.    Jurisdiction

In his first issue, Cole claims the trial court lost jurisdiction over this case when he non-suited "Specialty Sand, the last silica Defendant from whom Mr. Cole could recover solely due to silica sand exposure."  Cole complains the trial court "overlooked . . . the dismissal of the sand companies, the two exclusively silica defendants" against whom "silica injury claims could be asserted."  He contends that an alternative pleading alleging he was injured by silica or olivine exposure "cannot be the basis for jurisdiction when the evidence developed in the case indicates otherwise," *i.e.*, "once the evidence fully developed, it could be reasonably concluded that Mr. Cole had no exposure to crystalline silica" and, thus, the trial court lacked jurisdiction over the case.  Cole also contends that he amended his petition to "remove references to crystalline silica dust."

### A.    Standard of Review and Applicable Law

Subject matter jurisdiction is never presumed, cannot be conferred by consent or estoppel, and cannot be waived. *See Wilmer-Hutchins Indep. Sch. Dist. v. Sullivan*, 51 S.W.3d 293, 294 (Tex. 2001) (per curiam); *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000); *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76 (Tex. 2000); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443-44 (Tex. 1993).  Even if not raised, issues affecting jurisdiction must be reviewed *sua sponte*. *M.O. Dental Lab v. Rape*, 139 S.W.3d 671, 673 (Tex. 2004)

---

[3] Cole nonsuited without prejudice Empire Abrasive Equipment Company, L.P. on November 20, 2019, The Quikrete Companies, LLC on October 7, 2021, and Specialty Sand Company on April 18, 2022.  Cole dismissed with prejudice 3M Company on March 3, 2022.

(per curiam); *Gantt v. Gantt*, 208 S.W.3d 27, 30 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Subject matter jurisdiction is essential to the authority of a court to decide a case. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000); *Tex. Ass'n of Bus.*, 852 S.W.2d at 443. Whether a court has subject matter jurisdiction is a question of law that is reviewed *de novo*. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 625 (Tex. 2010) (per curiam); *State v. Holland*, 221 S.W.3d 639, 642 (Tex. 2007). When reviewing a trial court's ruling on a challenge to its jurisdiction, we consider the plaintiff's pleadings and factual assertions as well as any evidence in the record that is relevant to the jurisdictional issue. *See City of Elsa*, 325 S.W.3d at 625; *Bland Indep. Sch. Dist.*, 34 S.W.3d at 555. When considering the pleadings, we construe them liberally in favor of the plaintiff, look to the pleader's intent, and determine if the pleader has alleged facts affirmatively demonstrating the court's jurisdiction. *See City of Elsa*, 325 S.W.3d at 625; *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004).

## B.     Amended Petition

In his brief, Cole states that he "amended his petition to remove references to crystalline silica dust." The record shows that he filed a fourth amended petition removing any references to silica. However, he filed the petition after the trial court held a hearing on Exxon's "Objections to Causation Evidence and Motion for Summary Judgment" and signed an order sustaining Exxon's objections and granting Exxon's motion for summary judgment on May 6, 2022. To the extent Cole claims this fourth amended petition divested the trial court of jurisdiction, he is mistaken.

Texas Rule of Civil Procedure 166a(c) requires the trial court to consider the pleadings "on file at the time of the hearing, or filed thereafter and before judgment

7

with permission of the court." Tex. R. Civ. P. 166a(c). However, Texas Rule of Civil Procedure 63 requires a party to obtain leave of court to amend its pleading within seven days of the trial or thereafter. *See* Tex. R. Civ. P. 63. This rule applies to a summary judgment proceeding because it is a trial for purposes of this rule. *Horie v. Law Offices of Art Dula*, 560 S.W.3d 425, 431 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *see Goswami v. Metro. Sav. & Loan Ass'n*, 751 S.W.2d 487, 490 (Tex. 1988). Therefore, Rule 63 requires a party to obtain leave of court to amend its pleading within seven days of the summary judgment hearing or thereafter. *See Goswami*, 751 S.W.2d at 490. Leave must be granted unless it is shown that the filing will operate as a surprise to the opposing party. *See id.*

If an amended pleading is filed before a summary judgment hearing but within the seven-day window, an appellate court will presume leave was granted to file when an order states that all pleadings were considered, the record does not indicate that an amended pleading was not considered, and the opposing party does not show surprise. *MedStar Funding, LC v. Willumsen*, 650 S.W.3d 809, 814 (Tex. App.—Houston [14th Dist.] 2022, no pet.); *see also Goswami*, 751 S.W.2d at 490. This presumption does not apply when an amended pleading is filed after the summary judgment hearing. *MedStar Funding, LC*, 650 S.W.3d at 814; *Horie*, 560 S.W.3d at 431-32.

After the summary judgment hearing but before the trial court renders judgment, a party must obtain leave of court to amend a pleading. Tex. R. Civ. P. 166a(c). The reviewing court will not consider an amended pleading filed without the trial court's permission after the summary judgment hearing; an untimely amended petition filed without leave does not supersede the prior petition. *MedStar Funding, LC*, 650 S.W.3d at 814. Additionally, a trial court cannot grant

a motion to amend pleadings once the trial court renders judgment. *Brumfield v. Williamson*, 634 S.W.3d 170, 211 (Tex. App.—Houston [1st Dist.] 2021, pet. denied); *In re Haines*, No. 04-18-00654-CV, 2018 WL 6182826, at *2 (Tex. App.—San Antonio Nov. 28, 2018, orig. proceeding [mand. denied]) (mem. op.); *Prater v. State Farm Lloyds*, 217 S.W.3d 739, 741 (Tex. App.—Dallas 2007, no pet.).

The record shows that Cole filed his fourth amended petition without the trial court's permission after the trial court held a hearing and signed an order granting summary judgment in favor of Exxon on all his claims on May 6, 2022. Thus, his fourth amended petition did not supersede his third amended petition which therefore remained the live pleading in the case. *See MedStar Funding, LC*, 650 S.W.3d at 814 ("[we] will not consider an amended pleading filed without the trial court's permission after the summary judgment hearing"; "an untimely amended petition filed without leave does not supersede the prior petition"); *Denman v. Citgo Pipeline Co.*, 123 S.W.3d 728, 735 (Tex. App.—Texarkana 2003, no pet.) (refusing to consider amended petition because it was filed after the trial court granted the motion for summary judgment); *Taylor v. Sunbelt Mgmt., Inc.*, 905 S.W.2d 743, 745 (Tex. App.—Houston [14th Dist.] 1995, no writ) ("we cannot consider appellants' pleadings which were admittedly filed *after* the motion for summary judgment hearing") (emphasis in original).

Accordingly, Cole's fourth amended petition could not have divested the trial court of jurisdiction.

## C. Live Petition and Evidence

Cole contends that an alternative pleading alleging he was injured by silica or olivine exposure "cannot be the basis for jurisdiction when the evidence developed in the case indicates otherwise." He claims that "once the evidence

9

fully developed, it could be reasonably concluded that Mr. Cole had no exposure to crystalline silica" and, thus, the trial court lacked jurisdiction over the case. We disagree.

We first note that Cole fails to cite any authority for his assertion that "an alternative pleading cannot be the basis for jurisdiction when the evidence developed in the case indicates otherwise." Moreover, with regard to the claims he asserted against Exxon, Cole did not plead silica sand in the alternative. Instead, he only referenced silica and never mentioned olivine. Among other things, Cole alleged that "Plaintiff would show that [Exxon] was negligent in the following particulars:" (1) "in failing to enforce pre-existing policies previously enforced at facilities prohibiting the use of silica sand in abrasive blasting and failing to promulgate and establish safety guidelines which required an abrasive material other than silica sand in abrasive blasting operations at its facility;" (2) "in failing to take the necessary remedial action of eliminating silica sand as a blasting abrasive at its facility;" and (3) "in failing to warn Plaintiff, STANLEY COLE, of the unreasonably dangerous hazards created by heavy concentrations of respirable dusts and/or fumes and that silica sand should not be used in abrasive blasting which were present in excessive concentrations at the Defendant's plant." Throughout his petition, Cole overwhelmingly referenced silica and mentioned olivine significantly less.

Further, evidence that Cole did not blast with sand and was not exposed to silica dust might not have been strong, but it did not conclusively establish the opposite, *i.e.*, that he did not blast with sand and was not exposed to silica dust. It is undisputed that Cole in his deposition testified that he never heard of olivine, always blasted with sand, and never used "any other abrasive other than sand for blasting." He also testified the sand he used for blasting came in brown fifty or

10

one-hundred-pound sacks from companies called Quikrete and Specialty Sand.

Although Prokar's owner Shreve testified in his deposition that his company did not use sand as the abrasive for blasting during Cole's employment but bought a silica-free abrasive called olivine, Shreve admitted that there is a "possibility that sand could have been purchased on occasion for blasting from the period of 1998 to 2005." Thus, contrary to Cole's assertion, the evidence is conflicting and does not establish that he had no exposure to sand and only used olivine abrasive in his work.

Accordingly, the live petition and evidence support the trial court's jurisdiction over this case.

### D. Nonsuited Defendants

Finally, Cole asserts the trial court lost jurisdiction over this case when he non-suited "Specialty Sand, the last silica Defendant from whom Mr. Cole could recover solely due to silica sand exposure." He asserts the trial court "overlooked . . . the dismissal of the sand companies, the two exclusively silica defendants" against whom "silica injury claims could be asserted." We disagree.

The sand companies were not the only defendants against which Cole brought claims involving silica sand. For instance, with respect to Exxon, Cole specifically referenced silica sand and alleged in his live petition:

> The evidence will show that **EXXON MOBIL** failed to exercise this supervisory control in a reasonable manner. By authorizing and/or allowing the use of silica sand in abrasive blasting operations inside its plant premises, **EXXON MOBIL** failed to eliminate or correct an unreasonably dangerous and ultrahazardous condition at its Beaumont rail car facility. The evidence will show that allowing abrasive blasting operations to be conducted by operators using abrasive containing silica sand, **EXXON MOBIL** allowed an intrinsically unsafe and ultrahazardous activity to be conducted without regard to

11

the safety and well-being of those individuals on its premises. The evidence will also show that allowing such an ultrahazardous activity contradicted and violated previous policies of **EXXON MOBIL** to prohibit use of silica sand in abrasive blasting operations. Such a failure constitutes negligence which was the proximate cause of Plaintiffs injuries and damages. Pleading further, Plaintiff would show that the Defendant was negligent in the following particulars:

> (a) in failing to enforce pre-existing policies previously enforced at facilities prohibiting the use of silica sand in abrasive blasting and failing to promulgate and establish safety guidelines which required an abrasive material other than silica sand in abrasive blasting operations at its facility; . . .

> (c) in failing to take the necessary remedial action of eliminating silica sand as a blasting abrasive at its facility; . . .

> (g) in failing to warn Plaintiff, STANLEY COLE, of the unreasonably dangerous hazards created by heavy concentrations of respirable dusts and/or fumes and that silica sand should not be used in abrasive blasting which were present in excessive concentrations at the Defendant's plant . . . .

Therefore, nonsuiting the sand companies did not divest the trial court of jurisdiction over this case.

Accordingly, we overrule Cole's first issue.

## II. Expert Causation Evidence

Exxon filed "Objections to Causation Evidence and Motion for Summary Judgment" asserting that Cole's expert causation testimony from Cole's pulmonologist Dr. Haber and industrial hygiene and professional safety expert Parker is unreliable pursuant to *Havner* and *Robinson* and, therefore, should be excluded. Exxon stated that it was "entitled to a conventional summary judgment" because Cole cannot meet his burden showing the challenged expert testimony is reliable, but Exxon made no further reference to a traditional summary judgment. It did, however, argue that if the trial court grants its objections to causation

evidence, it "moves for a no-evidence summary judgment on the grounds that [Cole] ha[s] no admissible evidence of the essential element of medical causation." The trial court sustained Exxon's objections that Cole's causation evidence from Dr. Haber and Parker is unreliable and granted Exxon's motion for summary judgment.

In his second issue, Cole argues the trial court erred in not considering direct causation evidence that shows Cole's occupational dust exposure caused his disease because the evidence meets the reliability requirements of Texas Rule of Evidence 702. In his third issue, Cole contends the trial court erred in granting summary judgment because "Cole's mixed dust pneumoconiosis is an occupational lung disease recognized by Texas Courts." In his fourth issue, Cole contends he demonstrated under the *Havner* and *Borg-Warner*[4] standards that his exposure to olivine and other dust generally and specifically caused his mixed dust pneumoconiosis. We address each issue in turn.

## A.    Standard of Review and Governing Law

### 1.    Summary Judgment

We review the trial court's grant of summary judgment *de novo*. *JLB Builders, L.L.C. v. Hernandez*, 622 S.W.3d 860, 864 (Tex. 2021); *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 219 (Tex. 2017). In conducting our review, we take as true all evidence favorable to the nonmovant, indulge every reasonable inference in favor of the nonmovant, and resolve any doubts in the nonmovant's favor. *Parker*, 514 S.W.3d at 219; *see Helena Chem. Co. v. Cox*, 664 S.W.3d 66, 72 (Tex. 2023).

When a party moves for both traditional and no-evidence summary

---

[4] *Borg-Warner Corp. v. Flores*, 232 S.W.3d 765 (2007).

13

judgments, we consider the no-evidence motion first because if the non-movant did not produce evidence raising a genuine issue of material fact as to the challenged elements, a no-evidence summary judgment is proper and there is no need to address the challenge to the traditional motion because it necessarily fails. *Parker*, 514 S.W.3d at 219; *Merriman v. XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013). Therefore, we first review each claim under the no-evidence standard and any claims that survive our no-evidence review will be reviewed under the traditional standard. *See Parker*, 514 S.W.3d at 219.

In a no-evidence summary judgment motion, the movant represents there is no evidence of one or more essential elements of a claim for which the nonmovant bears the burden of proof at trial. Tex. R. App. P. 166a(i); *see Helena Chem. Co.*, 664 S.W.3d at 72. A court must grant a no-evidence summary judgment unless the nonmovant responds with competent evidence raising a genuine issue of material fact. *See* Tex. R. App. P. 166a(i); *Helena Chem. Co.*, 664 S.W.3d at 72. A party moving for traditional summary judgment meets its burden by proving there is no genuine issue of material fact and it is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Parker*, 514 S.W.3d at 220. A defendant moving for summary judgment must disprove at least one of the essential elements of each of the plaintiff's causes of action or conclusively establish all the elements of an affirmative defense. *Patel v. Patel & Patel, CPA*, No. 14-22-00769-CV, 2024 WL 1793014, at *4 (Tex. App.—Houston [14th Dist.] Apr. 25, 2024, no pet. h.) (mem. op.).

### 2. Causation

Each of the causes of action Cole alleged against Exxon required him to prove the element of causation. *See United Scaffolding, Inc. v. Levine*, 537 S.W.3d 463, 471 (Tex. 2017) (elements of a premises liability claim include causation);

*Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976) (elements of assumption of risk claim include causation); *Segovia v. Houston Metals, LLC*, No. 14-22-00130-CV, 2023 WL 4732887, at *3 (Tex. App.—Houston [14th Dist.] July 25, 2023, no pet.) (mem. op.) (same);. Both proximate and producing cause require a showing of cause-in-fact, *i.e.*, that the defendant's conduct or product was a substantial factor in bringing about the plaintiff's injury. *See Borg-Warner Corp. v. Flores*, 232 S.W.3d 765, 770 (Tex. 2007). Cole alleged that his disease, mixed dust pneumoconiosis, was caused by exposure to olivine dust when he worked as a blaster at Exxon's facility. The existence of a causal connection between exposure to a certain chemical or product and injury or disease requires specialized expert knowledge and testimony because such matters are not within the common knowledge of lay persons. *Abraham v. Union Pac. R.R. Co.*, 233 S.W.3d 13, 18 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Exxon objected to Cole's expert causation testimony asserting it was unreliable and should be excluded. A party may object to the reliability of expert testimony either before trial or when it is offered. *See Guadalupe–Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002). Once such an objection is made, the burden is on the proponent of the evidence to establish its reliability and, thus, its admissibility. *Id.*; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (per curiam); *see Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam). A trial court abuses its discretion if its decision is arbitrary, unreasonable, or without reference to guiding principles. *K-Mart Corp.*, 24 S.W.3d at 360.

A witness may be qualified to testify as an expert based on his "knowledge,

skill, experience, training, or education." Tex. R. Evid. 702; *Helena Chem. Co.*, 664 S.W.3d at 73. In addition to showing that an expert witness is qualified, Texas Rule of Evidence 702 requires the proponent to show that the expert's testimony is based upon a reliable foundation. *Robinson*, 923 S.W.2d at 556; *Austin v. Kerr-McGee Ref. Corp.*, 25 S.W.3d 280, 284 (Tex. App.—Texarkana 2000, no pet.).

In determining the reliability of expert testimony, we must consider not just whether the expert's methods are grounded in science, but also whether the data to which the expert applies his methods are reliable. *Helena Chem. Co.*, 664 S.W.3d at 73-74. "If the foundational data underlying opinion testimony are unreliable, an expert will not be permitted to base an opinion on that data because any opinion drawn from that data is likewise unreliable." *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). Additionally, expert testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology. *Id*. A flaw in an expert's reasoning from the data "may render reliance on a study unreasonable and render the inferences drawn therefrom dubious." *Id*. Also, "'if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded.'" *Helena Chem. Co.*, 664 S.W.3d at 74 (quoting *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex. 2005)).

Therefore, when expert testimony is not grounded in the methods and procedures of science, it amounts to nothing more than subjective belief or unsupported speculation. *Builder Servs. Grp., Inc. v. Taylor*, No. 03-18-00710-CV, 2020 WL 5608484, at *3 (Tex. App.—Austin Sept. 17, 2020, pet. denied) (mem. op.); *see Robinson*, 923 S.W.2d at 557. In this context, the expert's testimony is unreliable and it is no evidence of causation. *See Havner*, 953 S.W.2d at 713.

Likewise, "expert testimony is unreliable if 'there is simply too great an analytical gap between the data and the opinion proffered.'" *Helena Chem. Co.*, 664 S.W.3d at 74 (quoting *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998)). Courts are not required to ignore fatal gaps in an expert's analysis or assertions that are simply incorrect. *Id*. "'Analytical gaps may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached.'" *Id*. (quoting *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 349 (Tex. 2015)).

To augment the above standards, the supreme court set out six non-exclusive "*Robinson* factors" courts may consider in determining whether expert testimony is reliable and, thus, admissible under Rule 702: (1) the extent to which the theory has been or can be tested; (2) the extent to which the techniques rely on the subjective interpretation of the expert; (3) whether the theories have been subjected to peer review and/or publication; (4) the techniques' potential rate of error; (5) whether the underlying theories or techniques have been generally accepted as valid by the relevant scientific community; and (6) the nonjudicial uses which have been made of the theories or techniques. *Robinson*, 923 S.W.2d at 557; *Austin*, 25 S.W.3d at 284.

The supreme court also discussed a plaintiff's burden in a toxic tort case to prove general and specific causation. *See Havner*, 953 S.W.2d at 714-15. General causation exists when a substance is capable of causing a particular injury or condition in the general population while specific causation involves whether the substance at issue in fact caused a particular individual's injury or condition. *BIC Pen Corp. v. Carter*, 346 S.W.3d 533, 545 (Tex. 2011); *Havner*, 953 S.W.2d at

17

714. A plaintiff may establish specific causation through controlled scientific experiments with objective criteria by which it can be determined with reasonable certainty that the particular injury or condition was caused by exposure to a given substance. *See BIC Pen Corp.*, 346 S.W.3d at 545; *Havner*, 953 S.W.2d at 714-15. However, because when dealing with a toxic substance direct experimentation many times may not be possible to prove causation, a plaintiff may try to demonstrate that exposure to the substance at issue increases the risk of the particular disease through epidemiological studies. *Havner*, 953 S.W.2d at 714-15.

Such studies examine existing populations to determine if there is an association between a disease or condition and a factor suspected of causing the disease or condition. *Id*. at 715. The supreme court recognized that "epidemiological studies showing that the population exposed to a toxin faced more than double the risk of injury facing the unexposed or general population could be used to establish causation." *Bostic v. Georgia-Pac. Corp.*, 439 S.W.3d 332, 347 (Tex. 2014). But a relative risk of more than 2.0 is not a "litmus test" or "bright-line boundary," and generally a single study will not suffice to establish legal causation. *Id*.; *Havner*, 953 S.W.2d at 718.

When considering epidemiological studies, courts are to consider the "significance level" or "confidence level" of the studies. *Bostic*, 439 S.W.3d at 347; *Havner*, 953 S.W.2d at 723-24. To be considered scientifically reliable, an epidemiological study must (1) show a relative risk of 2.0, and (2) be statistically significant at the 95% confidence level and have a confidence interval that does not include the number 1. *Bostic*, 439 S.W.3d at 347; *Havner*, 953 S.W.2d at 723. An expert "cannot dissect a study, picking and choosing data, or 'reanalyze' the data to derive a higher relative risk if this process does not comport with sound scientific methodology." *Havner*, 953 S.W.2d at 720. The *Havner* court reiterated that

18

"even if a statistically significant association is found, that association does not equate to causation." *Id*. at 724. The supreme court "noted that '[t]here are many other factors to consider in evaluating the reliability of a scientific study including, but certainly not limited to, the sample size of the study, the power of the study, confounding variables, and whether there was selection bias.'" *Bostic*, 439 S.W.3d at 347 (quoting *Havner*, 953 S.W.2d at 724).

However, general causation is never the ultimate issue of causation tried to the factfinder in toxic exposure cases; instead, the "ultimate issue is always specific causation" — whether the alleged substance or product in fact caused the plaintiff's injury or condition. *See id*. at 351. General causation as established through epidemiological studies may be relevant only inasmuch as it informs specific causation. *Id*. "[W]here direct evidence of specific causation is unavailable, specific causation may be established through an alternative two-step process whereby the plaintiff establishes general causation through reliable studies, and then demonstrates that his circumstances are similar to the subjects of the studies." *Id*.

This burden includes proof that (1) the injured plaintiff was exposed to the same substance, (2) the exposure or dose levels were comparable to or greater than those in the studies, (3) the exposure occurred before the onset of the injury or condition, (4) the timing of the onset of the injury or condition was consistent with that experienced by those in the study, and (5) if there are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *Id*. at 359; *Havner*, 953 S.W.2d at 720. The supreme court reiterated that "[p]roof of substantial factor causation requires some quantification of the dose resulting from [plaintiff's] exposure to [the] products." *Bostic*, 439 S.W.3d at 355.

With these concepts in mind, we turn to Cole's second and fourth issues and consider whether his experts provided reliable causation evidence.

## B. Direct Causation Evidence

In his second issue, Cole argues the trial court erroneously excluded his experts' testimony because it constituted "direct causation evidence" showing his occupational dust exposure caused his occupational lung disease, mixed dust pneumoconiosis. Cole argues the trial court erred in failing to consider Parker's calculations of Cole's actual exposure concentrations to olivine dust as well as to nickel and chromium dusts contained in olivine when Exxon's "air sampling of Mr. Cole in his abrasive blasting work" allowed Parker to calculate direct evidence of Cole's "astronomical" exposure and dose. In support of his contentions, Cole makes several arguments we address in turn.

### 1. Waiver

Cole asserts that, in the trial court, Exxon did not challenge Parker's dose calculations or object to the proof showing his high dust burden but only "objected to the epidemiological analysis of the hazards associated with olivine, without considering the impact of nickel and chromium dust, and without considering the impact of exponentially high levels of dust exposure on a human lung." Cole is wrong. Exxon did challenge and object to Parker's dose calculations in its reply to Cole's summary judgment response. Exxon argued that Parker's dose estimates are unreliable because, in his calculations, Parker improperly used a significantly lower assigned protective factor for the air-fed hood Cole was using during abrasive blasting with olivine.

### 2. Exposure and Dose Calculations

Cole contends the trial court "failed to evaluate the direct evidence of

20

exposure assessment performed on Mr. Cole" because the "dose calculations show Mr. Cole's dust exposure was the substantial contributing factor for his mixed dust pneumoconiosis and pulmonary fibrosis."[5]

Cole claims that Parker used an Occupational Safety and Health Administration ("OSHA") permissive exposure limit ("PEL") and a National Institute for Occupational Safety and Health ("NIOSH") recommended exposure limit ("REL") for olivine, which includes small amounts of nickel and chromium in its composition,[6] to determine Cole's exposure to olivine, nickel, and chromium relative to the federal permissible and recommended exposure limits.[7] Cole explains Parker used data from air monitoring that Exxon performed outside of the air-fed hood Cole wore during blasting to compare the exposure concentration to federal guidelines. According to his affidavit, Parker used the maximum[8] olivine exposure concentration of 224.1 mg/m³, applied a protection factor of 5 for the hood Cole wore during blasting, calculated the exposure duration and the estimated time weighted average ("TWA") for the years Cole blasted with olivine, and concluded based on his calculations that Cole's "cumulative dose of olivine amounted to 341.2 mg/m³ dose years of olivine dust" which is, according to Parker, 5.8 times the maximum NIOSH recommended exposure limit.

Parker performed similar calculations for Cole's nickel and chromium dust

---

[5] We note that in his briefing Cole seems to conflate direct evidence of exposure with direct evidence of causation. But direct evidence of exposure does not equate to direct evidence of causation, and Cole does not cite any authority that would support such an equation. Nonetheless, we proceed to address Cole's argument as presented.

[6] According to the Material Safety Data Sheet ("MSDS"), olivine used by Cole for blasting was composed of >99.3% olivine, 0.1-0.3% nickel, and 0.1-0.4% chromium.

[7] In fact, Parker only used the NIOSH recommended exposure level, not the OSHA permissible exposure level.

[8] The minimum olivine exposure concentration was measured at 53 mg/m³ while the mean exposure concentration was 166.6 mg/m³.

exposure, although it is unclear if he applied a protection factor of 5 to account for Cole wearing a hood while blasting, as he did for olivine dust. Parker calculated Cole's dose at "0.66mg/m³ - work years of nickel dust" and Cole's dose of chromium dust at 1.19 mg/m³ - work years. Parker "estimated that Cole was exposed to nickel 11.3 times above the NIOSH REL," although Parker did not estimate how many times above the recommended exposure limit Cole's exposure was to chromium.

Cole contends that, from the dose calculations (1) Parker concluded that "dust from the olivine abrasive contaminated with nickel and chromium was a substantial contributing factor for creating a risk of an occupational lung disease causing pulmonary fibrosis," and (2) Dr. Haber concluded that exposure to such "very high levels of dusts, even dusts with high exposure limits, causes lung inflammation." Therefore, Cole contends, the "toxicity of the substances that make up the olivine abrasive and the surfaces blasted coupled with the extremely high dust exposure caused [him] mixed dust pneumoconiosis and the trial court erred when it failed to consider the dose calculations for [his] exposure."

However, the problem with Cole's argument is that Parker used an incorrect protection factor which rendered his dose calculations incorrect and, thus, unreliable. Cole acknowledges that, based on a 1975 study by Samimi,[9] Parker used in his exposure calculations a protection factor of 5 for the air-fed hood Cole wore while blasting olivine. As we explain below, the applied protection factor

---

[9] Samimi, B. et al, *The Efficiency of Protective Hoods Used by Sandblasters to Reduce Silica Dust Exposure*, American Industrial Hygiene Association Journal (1975). Parker once cited to another study by Samimi but did not discuss it or rely on it: Samimi, B. et al*, Respirable Silica Dust Exposure of Sandblasters and Associated Workers in Steel Fabrication Yards*, Archives of Environmental Health, Vol. 29, (1974). Citing to Parker's affidavit, Cole states in his brief that the "Samimi studies are the preeminent published, peer reviewed studies of sandblasters." The citation does not support this statement nor did we find any evidence in Parker's affidavit supporting the statement.

was not supported by evidence for several reasons, rendering Parker's dose calculations and causation opinion unreliable.

Parker relied on the 1975 Samimi study to assess the effectiveness of Cole's air-fed hood manufactured by Clemco. In his affidavit, Parker stated that Samimi "measured dust concentrations outside and inside of a hood substantially similar to the [Clemco] Apollo Hood used by" Cole. However, Parker did not cite to any evidence supporting his contention that the hood Samimi used to measure in 1975 was "substantially similar" to the Clemco hood Cole wore over two decades later from 1998 to 2005. Parker stated that Samimi "measured total dust concentrations averaging 2.0 mg/m³ outside the hood and 0.4 mg/m³ inside the hood similar to the Apollo hood during blasting."[10] Parker then asserted that the "protection factor is determined by dividing the outside concentration [2 mg/m³] by the inside concentration [0.4 mg/m³]. The protection factor for the hoods similar to the Apollo hood is approximately 5." But Parker cited no authority in support of his assertion that this is how the protection factor is determined or that Cole's Clemco hood was similar to the hoods measured in the Samimi study.[11]

Parker also stated that a protection factor of 5 "is much less tha[n] the 25 APF Clemco relies on, but a 5 PF is more likely what should have been applied."

---

[10] Recognizing that Cole blasted with olivine while Samimi measured blasting with sand, Parker stated in his affidavit that "[o]livine, as an abrasive, is substantially equal to sand in the energies used to propel the abrasive and the dust concentrations produced." But Parker cited no evidence to support his contention.

[11] We also note that Table 1 of the Samimi study on which Parker relied for the 2 mg/m³ outside the hood dust concentration and the 0.4 mg/m³ inside the hood dust concentration shows a "mean concentration" for slow blasting operations for up to 2.5 hours. But for operations of five hours and up (Cole blasted six hours) Samimi measured an outside the hood "mean concentration" of 37.2 mg/m³, and there is no data for an inside hood concentration when blasting five hours and up. Also, Parker used the maximum dust concentration for his exposure and dose calculations, not the mean concentration.

In claiming that the Clemco air-fed hood Cole used for blasting had an assigned protection factor ("APF") of 25, Parker cited to NIOSH, Respirator Decision Logic (1987) and ANSI[12] American National Standard for Respiratory Protection, Z.88 (1992). The NIOSH Respirator Decision Logic states that "any powered air-purifying respirator equipped with a hood or helmet and any type of particulate filter" or "any supplied-air respirator equipped with a hood or helmet operated in a continuous flow mode" has an APF of 25. It is unclear whether Cole's hood qualifies as one of the hoods described. But assuming that it does, the APF of 25 by NIOSH is negated by the ANSI Standard on Respiratory Protection assigned APF of 1,000 for powered air-purifying hoods which Parker relied on.

Further, neither Parker nor Cole negated or in any way addressed the expert report of Exxon's industrial hygienist Alan Leibowitz, in which Leibowitz stated that while NIOSH published guidance that continuous flow respirators with a hood might only have a protection factor of 25, "that was soon modified by OSHA" publishing "guidance clarifying the process for manufacturers to prove that their Supplied-Air Respirator (SAR) or Airline Respirators with a helmet and hood did in fact merit an APF of 1000. Clemco performed that analysis in 2010 confirming that the respirators used by Mr. Cole qualified for an APF of 1000." Leibowitz also confirmed that "[a]ccording to the 1992 ANSI 'American National Standard for Respiratory Protection' Z88.2, atmosphere supplying, continuous flow respirators with a helmet and hood had an assigned respiratory protection factor of 1000."

Additionally, Cole did not negate deposition testimony from Lindsay Booher, who was Exxon's corporate industrial hygiene manager at the time Cole blasted at Exxon's facility. Booher testified that the air-fed hood Cole was

_____

[12] ANSI stands for American National Standards Institute.

wearing had an APF of 1,000 based on the manufacturer's data.

Considering the evidence in the record, we cannot agree that the Clemco air-fed hood Cole wore for blasting had a protection factor of 5 or 25; instead, the protection factor was 1,000. With the correct protection factor, Parker's dust exposure and dose calculations should have been significantly less. We see no evidence in the record that shows the dust exposure when calculated with the correct protection factor violates recommended exposure limits for olivine, nickel, or chromium dust. Having used a significantly lower protection factor than the hood's APF of 1,000 in his calculations, we cannot conclude that Parker's dose estimates and his causation opinion are reliable. *See Helena Chem. Co.*, 664 S.W.3d at 74 (stating "if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded;" and expert testimony is unreliable if there is too great an analytical gap between the data and the opinion proffered — analytical gaps "may include circumstances in which the expert unreliably applies otherwise sound principles and methodologies, the expert's opinion is based on assumed facts that vary materially from the facts in the record, or the expert's opinion is based on tests or data that do not support the conclusions reached"); *Havner*, 953 S.W.2d at 714 (stating expert testimony is unreliable even when the underlying data are sound if the expert draws conclusions from that data based on flawed methodology). Likewise, and contrary to Cole's assertion, Dr. Haber's opinion based on Parker's dose calculations that exposure to such "very high levels of dusts, even dusts with high exposure limits, causes lung inflammation" is not reliable. *See Helena Chem. Co.*, 664 S.W.3d at 74; *Havner*, 953 S.W.2d at 714.

### 3. Overwhelming Dust Burden

Within his direct-evidence-of-causation argument, Cole also contends the

trial court erred in failing to consider Dr. Haber's and Parker's expert opinions "that excessive dust exposure will plausibly cause damage to the human lung."

In that regard, Cole contends Dr. Haber explained in his affidavit that "Cole's lungs were exposed to 'huge dust burdens' which will cause inflammation and lung damage." According to Cole, Dr. Haber relied on several dust loading articles that "illustrate the absorption rate in the body relating to the pulmonary retention of excessive dust exposure as it impacts the lung;" and these "articles illustrate Dr. Haber's opinion and the widely accepted medical position that inhalation of excessive dust will cause inflammation of the lung tissue and cause fibrosis." However, considering that Dr. Haber relied on Parker's incorrect and unreliable exposure and dose calculations (as explained above), Dr. Haber's opinion that Cole suffers from lung inflammation and lung damage because he was "exposed to very high levels of dust as reflected in the Parker affidavit," is not reliable. *See Helena Chem. Co.*, 664 S.W.3d at 74; *Havner*, 953 S.W.2d at 714.

To support his argument that the trial court should have considered Parker's expert opinion, Cole states that Parker relied on multiple NIOSH and OSHA studies, which "draw the conclusion that abrasive blasting, particularly in a confined space, generates large quantities and extreme concentrations of dust dangerous to the human respiratory system." However, because Parker's exposure and dose calculations were incorrect and unreliable, his opinion that Cole's exposure to olivine, nickel, and chromium "was a substantial contributing factor for creating a risk of disease, specifically an occupational lung disease causing pulmonary fibrosis" is equally unreliable. *See Helena Chem. Co.*, 664 S.W.3d at 74; *Havner*, 953 S.W.2d at 714.

Thus, contrary to Cole's assertion, there is no reliable direct evidence of an "astronomical" dose of olivine, nickel, or chromium and no reliable direct

26

causation evidence showing his occupational dust exposure caused his disease. Accordingly, we overrule Cole's second issue.

## C.     General and Specific Causation Evidence

Turning to his fourth issue, Cole argues the trial court erroneously excluded his expert evidence because, even though he presented "direct proof of his mixed dust pneumoconiosis and pulmonary massive fibrosis in the form of an excessively high dose" as he argued in his second issue, he "alternatively" also "present[ed] causation evidence that meets the general and specific causation standards of *Havner* and *Borg-Warner*." He claims his experts' "opinions align with the studies of lung impairment from heavy occupational exposure to low toxicity dusts as well as the studies showing the substances found in olivine cause fibrosis and pneumoconiosis as does olivine itself." He claims that because the studies Dr. Haber and Parker reference are published, peer reviewed, and "identify lung fibrosis due to significant occupational exposure to metal dust, olivine dust, and high occupational nuisance dust exposures like the pattern in [] Cole's lungs," their opinions "satisfy the relevancy and reliability requirement mandated by Rule 702."

In addressing Cole's arguments, we recall that specific causation may be established through a two-step process whereby the plaintiff (1) establishes general causation through reliable studies, *i.e.*, studies that show a relative risk of 2.0 and are statistically significant at the 95% confidence level and with a confidence interval that does not include the number 1; and (2) demonstrates that his circumstances are similar to the subjects of the studies, which includes proof that the injured plaintiff was exposed to the same substance, the exposure or dose levels were comparable to or greater than those in the studies, the exposure occurred before the onset of the injury or condition, the timing of the onset of the injury or condition was consistent with that experienced by those in the study, and if there

27

are other plausible causes of the injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty. *See Bostic*, 439 S.W.3d at 347, 351, 359; *Havner*, 953 S.W.2d at 720, 723.

With that in mind, we review the studies Cole asserts support a finding that the opinions Dr. Haber and Parker expressed in their respective affidavits are reliable and constitute reliable causation evidence.

## 1. Dust Overloading Studies

Cole first points us to what he asserts are dust overloading studies by John W. Cherrie[13] and P. E. Morrow.[14]  However, the article by Cherrie is not an epidemiological study; instead, as Cherrie himself states, it is a commentary positing that current British limits for low toxicity or nuisance dusts are not sufficiently protective.  Based on his review of several studies, Cherrie concluded in his commentary that research has shown that many dusts can produce chronic lung conditions from long-term exposures.

### a. Cherrie Commentary

Referring to the Cherrie commentary, Cole states Cherrie noted that studies of American and British coal miners showed exposure to coal dust caused the workers COPD and decreased lung function, and a study of workers exposed to polyvinyl chloride dust showed the workers had decreased lung function.  Cole also states that, according to the Cherrie "study, 12% of workers exposed to 4 mg/m³ of low-toxicity dust for 40 years would experience a marked loss of lung

---

[13] John W. Cherrie et al., *Low-Toxicity Dusts: Current Exposure Guidelines are not Sufficiently Protective*, Annals of Occupational Hygiene, Vol. 57, No. 6. (2013).

[14] P. E. Morrow, *Contemporary Issues in Toxicology, Dust Overloading of the Lungs: Update and Appraisal*, Toxicology and Applied Pharmacology, 113, 1-12 (1992).

function and breathlessness." Cole then claims that his "exposure far exceeds that of the workers in the Cherrie study" and that "[h]is exposure dose indicates that olivine at the levels experienced by [him] can cause mixed dust pneumoconiosis and progressive massive fibrosis."

The Cherrie commentary is not a study. Also, the commentary references studies involving workers exposed to coal and polyvinyl chloride dusts; it does not reference olivine dust or dust from any olivine components. There also is no information about the reliability of the studies Cherrie referenced in the commentary. Additionally, Cole does not support his assertion that "his exposure far exceeds that of the workers in the Cherrie study" with any evidence. To the extent Cole relies on Parker's exposure calculations for comparison, we already explained that Parker's exposure and dose estimates are unreliable.

b.    *Morrow Article*

The Morrow article also is not an epidemiological study; rather, as Morrow states: "This article reviews recent studies which involve, or impact on, the condition of dust overloading in the lungs of several species, especially the Fischer 344 rat. Its main purpose is to provide an update of the overload concept and new information of possible mechanistic relevance." The article does not provide any information about the reliability of the studies Morrow reviewed, which overwhelmingly involve rats and other animals.

Cole asserts that Dr. Haber does not just rely "on animal studies related to dust overload" because the studies in the Morrow article also "included discussion of human subject exposure." Although Morrow mentions three human studies in the article, neither he nor Dr. Haber explain what their significance is, if any, regarding human exposure to olivine, nickel, or chromium dusts and the development of lung disease. Understanding that there is insufficient information

29

about human pulmonary clearance, Morrow noted that "[o]bviously, mechanistic information on human pulmonary clearance is critically needed" and data "should be forthcoming." Notably, Morrow concludes his article by stating:

> The foregoing discussion touches on a number of problems which presently hinder our understanding of dust overloading. Some will be solved by systematic study, some will continue to challenge our ingenuity for many years to come. At the very least, we have gained a new appreciation of the F344 rat as an experimental model for inhalation toxicology. We may find, however, that dust overloading has comparably important implications in most species, including man. If this appears to be the case, then a decade of well-funded, properly designed studies will be needed to give us an appreciation of the magnitude of the overall problem, which includes *inter alia*, much needed relevant basic information on human alveolar cytokinetics, biochemistry, and pathogenesis.

We see no support in the Morrow article and Dr. Haber does not provide an explanation for why the article is the basis for his assertion that high levels of dust "exposure will cause increased interstitial dust uptake and prolonged inflammatory responses" in humans, including Cole.

Contrary to Cole's assertion, the Cherrie commentary and the Morrow article cannot support a reliable causation opinion.

### 2. Epidemiological Studies

Cole asserts that Dr. Haber's expert opinion is supported by five epidemiological studies and is reliable, meeting the *Havner* requirements. Dr. Haber opined in his affidavit:

> If Mr. Cole exclusively used olivine as an abrasive blasting agent, then this abrasive blasting agent would have significantly contributed to causing the pattern of lung scarring seen in Mr. Cole's lungs, which can be categorized as a mixed dust pneumoconiosis

30

(MDP) and have the appearance of IPF/UIP.[15]

      While such scarring can also be described as mixed dust pneumoconiosis, which I believe is a more accurate description, there is abundant medical literature that demonstrates that a person exposed to metal dusts, such as nickel (Ni) and chromium (Cr), can, in reasonable medical probability, contract pulmonary fibrosis in a UIP pattern, identical to Mr. Cole's condition. Some may term this IPF, even when not truly "idiopathic." Epidemiological studies show that a pattern of IPF/UIP radiological scarring occurs in individuals exposed to metal dust. Baumgartner reports a doubling of such risk for men due to exposure to metal dust (OR 2.3, with 95% Cl 1.1-4.8). Pinheiro reports a proportionate mortality ratio (PMSI) for interstitial pulmonary disease in workers exposed to metal mining at 2.4 (95%Cl 1.1-4.4) and metal fabrication at 1.9 (95%Cl 1.1-3.1). A third epidemiological study identified metal dusts and fumes as risk factors for UIP, having an OR 3.8 (95% Cl 1.2-12.2). In a fourth study, patients with cryptogenic fibrosing alveolitis (IPF) were more likely to report an occupational exposure to metal dust with an odds ratio of 10.97 (95%Cl 2.3-52,4). In a recent paper from the American Thoracic Society, the pooled OR for metal dusts and fumes causing 1PF/UIP was 2.0 (95%Cl 1.3-3.0).

(footnotes to citations omitted). Dr. Haber cited the following studies in support of his opinion; we review each study in turn.

### a.    *Baumgartner Study*

The Baumgartner[16] study was comprised of workers, ages 20 to 75, from 15 states involved in 16 occupations and exposed to seven different occupational agents. None of the occupational agents involved in the study included olivine dust, although metal dust was included. For males exposed to metal dust, the study

---

[15] IPF means idiopathic pulmonary fibrosis, and UIP means usual interstitial pneumonia.

[16] Kathy B. Baumgartner et al., *Occupational and Environmental Risk Factors for Idiopathic Pulmonary Fibrosis: A Multicenter Case-Control Study*, Am. J. of Epidemiology, Vol. 152, No. 4 (2000).

found an odds ratio[17] of 2.3 with a confidence interval of 1.1 to 4.8 at a 95% confidence level. This study might appear to be positive regarding "metal dust" except that we do not know which metals were included in the "metal dust" occupational agent category, *i.e.*, we do not know whether nickel and chromium were one of the metals included in "metal dust." Therefore, we do not know if Cole was exposed to the same substances as the workers in the study or if the substances were related to olivine and its components.

Additionally, the study contains no information about whether the workers exposed to the metal dust wore air-fed hoods and the hoods' assigned protection factor. Moreover, the study does not contain any information about the workers' level of exposure so that an assessment can be made if Cole's exposure or dose level was comparable to or greater than that in the study as required by *Havner* and *Bostic*. *See Bostic*, 439 S.W.3d at 359 (requiring plaintiff to demonstrate that his circumstances are similar to those of the study subjects, including comparable or greater exposure levels to the same substance); *Havner*, 953 S.W.2d at 720 (same). Dr. Haber cannot reliably link this study and Cole's asserted exposure estimates. Therefore, the Baumgartner study cannot support a reliable causation opinion.

b. *Pinheiro Study*

Relying on the Pinheiro[18] study, Dr. Haber stated that Pinheiro reported a proportionate mortality ratio for interstitial pulmonary disease in workers exposed to metal mining of 2.4 with a confidence interval of 1.1 to 4.4 at a 95% confidence level and in workers exposed to metal fabrication of 1.9 with a confidence interval

---

[17] "The numeric value of an odds ratio is at least equal to the relative risk, but the odds ratio often overstates the relative risk, especially if the occurrence of the event is not rare." *Havner*, 953 S.W.2d at 721.

[18] Germania A. Pinheiro, et al, *Occupational Risks for Idiopathic Pulmonary Fibrosis Mortality in the United States*, Int'l J. of Occupational & Envtl. Health Vol. 14(2) (2008).

of 1.1 to 1.3 at a 95% confidence level. Cole admits that he did not work in metal mining or metal fabrication but claims that his work "is commensurate with these jobs due to the high volume of heavy metal dust created in his confined space abrasive blasting." He relies on Parker's dose calculations stating he "had olivine exposures at a time weighted average concentration 5.8 times above the NIOSH" recommended exposure limit. But Cole's reliance on Parker's exposure and dose estimates is misplaced because they are incorrect and unreliable as we already explained, so Cole cannot reliably compare his blasting work exposure with metal mining or metal fabrication exposure.

Further, the Pinheiro study does not involve exposure to olivine dust nor does it mention the specific metals the workers in the study were exposed to in mining and metal fabrication. There is no statement that the workers wore air-fed hoods like Cole did and there is no data regarding the level of exposure to metals the workers experienced, so that Dr. Haber could not have assessed if Cole's exposure or dose level was comparable to or greater than that in the study to reliably link this study to Cole's asserted exposure estimates. *See Bostic*, 439 S.W.3d at 359 (requiring plaintiff to demonstrate that his circumstances are similar to those of the study subjects, including comparable or greater exposure levels to the same substance); *Havner*, 953 S.W.2d at 720 (same).

We also note the authors stated that the proportionate mortality ratios "only reflect[] the industrial profile of certain states and may not reflect the decedent's actual exposure. Lack of detailed information about past exposure to dusts, such as silica, asbestos, or grains, may contribute to misdiagnosis." This statement seems to indicate that the authors cannot be sure about the workers' actual exposure because the workers may also have been exposed to asbestos or silica dust, which would affect the solidity of the study results. The Pinheiro study cannot support a

33

reliable causation opinion.

### c.    *Paolocci Study*

The Paolocci[19] study involved farmers, veterinarians, gardeners, and metallurgic and steel industry workers in Italy with a mean age of 75. Based on the study results, the authors concluded that "metallurgical and steel industry workers . . . were occupations associated with UIP." As Dr. Haber stated, the "study identified metal dusts and fumes as risk factors for UIP, having an" odds ratio of 3.8 with a confidence interval of 1.2 to 12.2 at a 95% confidence level.

Cole acknowledges that he did not work as a metallurgical or steel industry worker but claims "the level of dust exposure including metal dust in Mr. Cole's work makes his work exposures comparable to the workers in metallurgical and steel industry occupations from the Paolocci study. Given the level of his dust exposure, Mr. Cole likely experienced an exposure greater or equal to the workers in the study." However, considering the study lacks any exposure data for the workers in the study, there is no way to compare their exposure to estimates Parker calculated for Cole's exposure, even if Parker's estimates were reliable which we have concluded they are not.

Also, the authors noted that "in a case-control study design [as is the Paolocci study], the criterion of temporality, with exposure preceding the onset of UIP, cannot be established safely, because exposure and disease are measured, unlike cohort study, simultaneously and UIP, as other chronic diseases, could also have been diagnosed later than the real onset." It is problematic that temporality cannot be safely established because *Havner* requires proof that the exposure occurred before the onset of the disease. *See Havner*, 953 S.W.2d at 720. And like

---

[19] Giulia Paolocci, et al., *Occupational Risk Factors for Idiopathic Pulmonary Fibrosis in Southern Europe: a case control study*, BMC Pulmonary Medicine, 18:75 (2018).

in the other studies, the Paolocci study does not involve exposure to olivine dust, does not state if the study subjects were exposed to nickel or chromium dust, and does not state whether the study subjects wore air-fed hoods as Cole did. *See Bostic*, 439 S.W.3d at 359 (requiring plaintiff to demonstrate that his circumstances are similar to those of the study subjects, including comparable or greater exposure levels to the same substance and that the exposure occurred before the onset of the disease); *Havner*, 953 S.W.2d at 720 (same). The Paolocci study cannot support a reliable causation opinion.

### d. Scott Study

The Scott[20] case-control study involved "40 [p]atients with cryptogenic fibrosing alveolitis and 106 community controls matched for age and sex who responded to a questionnaire." The authors' stated result was: "The patients with cryptogenic fibrosing alveolitis were more likely to report occupational exposure to metal dust (matched odds ratio 10.97 (95% confidence interval 2.30 to 52.4), $p<0.001$)."

As with the previous studies, the Scott study does not involve exposure to olivine dust, does not reveal the specific metal dust the study subjects were exposed to, does not state whether the study subjects wore air-fed hoods while exposed to metal dust, and does not contain any data about the level of exposure so that an assessment can be made regarding whether Cole's exposure or dose level was comparable to or greater than that in the study as required by *Havner* and *Bostic*. *See Bostic*, 439 S.W.3d at 359 (requiring plaintiff to demonstrate that his circumstances are similar to those of the study subjects, including comparable or

---

[20] Jonathan Scott, et al., *What are the causes of cryptogenic fibrosing alveolitis? A case study of environmental exposure to dust*, Brit. Med. J., 301:1015 (1990).

greater exposure levels to the same substance); *Havner*, 953 S.W.2d at 720 (same).

Additionally, the study authors expressed concern that "[s]everal metal dusts have been implicated as causes of pulmonary fibrosis, but whether in our patients metal and wood dusts were true fibrotic agents or markers of exposure to other fibrogens is not clear. For example, workers exposed to metal dust are often also exposed to grinding or lubricating materials." With that concern, the authors did not present a conclusion regarding causation but stated: "Clearly, the extent of confounding by exposure to other agents needs to be explored, but the necessary detail is not available in the present study." Dr. Haber's causation opinion based on this study is incompatible with the authors' conclusions. The Scott study cannot support a reliable causation opinion.[21]

### 3. Research Study

Dr. Haber and Parker cite the Hendrix[22] study which Cole refers to as the lunar dust study. The study was done in preparation for a scheduled 2025 moon landing to better understand the hazards lunar dust inhalation would pose to humans. For the study, "San Carlos olivine was used as an analog of lunar olivine, a common component of lunar dust." Olivine was dissolved in simulated lung fluid and simulated gastric fluid over a two-week period. The authors estimated based on the derived dissolution rate data "that an inhaled 1.0 μm diameter olivine particle would take approximately 24 years to dissolve in the human lungs and

---

[21] We note that Cole also mentions a fifth study: Blanc, et al., *The Occupational Burden of Nonmalignant Respiratory Disease. An Official American Thoracic Society and European Respiratory Society Statement*, Am. J. of Respiratory and Critical Care Medicine, 199:1312 (2019). However, Cole has not provided us with a cite to the study nor have we found any information about this study in the record. Cole also has not presented any argument as to why this study would support a reliable causation opinion.

[22] Donald A. Hendrix, et al., *Olivine Dissolution in Simulated Lung and Gastric Fluid as an Analog to the Behavior of Lunar Particulate Matter Inside the Human Respiratory and Gastrointestinal Systems*, GeoHealth Vol. 5, Issue 11 (2021).

approximately 3 weeks to dissolve in gastric fluid."

To support their contention that olivine is an inflammatory and fibrogenic dust that causes lung scarring, both Parker and Dr. Haber quote in their respective affidavits the following statements by the study authors: "Equilibrium thermodynamic models indicate that olivine in the human lungs can precipitate secondary minerals with fibrous crystal structures that have the potential to induce detrimental health effects similar to asbestos exposure. Our work indicates that inhaled lunar dust containing olivine can settle in the human lungs for years and could induce long-term potential health effects like that of silicosis."

However, as the supreme court noted, statements to the effect that a substance can, could, or has the potential to cause a disease is not evidence that in reasonable probability it does; the fact that olivine can have a detrimental effect on the human lungs "is 'the beginning, not the end of the scientific inquiry and proves nothing about causation without other scientific evidence.'" *See Havner*, 953 S.W.2d at 729-30.

Dr. Haber and Parker fail to acknowledge in their affidavits the study authors' conclusions, which align with the above stated pronouncements in *Havner*:

> The long-term effects of lunar dust exposure are not well known but if they are similar to the long-term effects of asbestos exposure on Earth then lunar explorers could face decades of health concerns if dust mitigation systems are not adequate or fail. . . . Significantly more studies need to be conducted in order [to] understand lunar dust reactivity, toxicity, and bioaccessibility in biologically relevant aqueous media. . . . More work needs to be done in both understanding the toxicity of olivine dusts and the mitigation of potential side effects.

The lunar dust study does not support a reliable causation opinion.

37

### 4. Worker Population Studies

Lastly, Cole contends that significant worker population studies demonstrate that workers exposed to nickel and chromium dust will develop pneumoconiosis as he is experiencing. In support of his contention, he cites to the first page of Dr. Haber's affidavit, the first page of Parker's affidavits, the first page of a nearly 300-page NIOSH publication on criteria for a recommended standard on occupational exposure to inorganic nickel from 1977, and the first page of a 1978 NIOSH occupational health guideline for chromium metal and insoluble chromium salts.

With regard to the 1977 NIOSH publication on criteria for a recommended standard on occupational exposure to inorganic nickel, Parker stated in his affidavit that NIOSH "concluded that nickel dust could cause, among other things, a nickel pneumoconiosis. NIOSH further observed a study of nickel exposure where workers were primarily exposed to iron but also had exposures to much smaller levels of chromium and nickel. NIOSH attributed the pneumoconiosis to the smaller amounts of nickel and chromium as the primary cause of this lung fibrosis." But the portions cited by Parker in his affidavit do not support his statements. Moreover, a conclusion that "nickel dust could cause" pneumoconiosis is not evidence that in reasonable probability it does cause it.[23] *See id*. at 729 ("not[ing] that testimony to the effect that a substance 'could' or 'can' cause a disease or disorder is no evidence that in reasonable probability it does").

Dr. Haber cited to the 1978 NIOSH guideline for chromium in his affidavit, stating that:

> NIOSH also reports that workers engaged in the production of

---

[23] Citing the identical portions of the 1977 NIOSH publication, Dr. Haber makes the same statements in his affidavit as Parker did.

ferrochrome alloys containing chromium metal have developed a "nodular type" pulmonary disease with impairment of pulmonary function. NIOSH identifies reports of chromium exposed workers suffering from "exaggerated pulmonic markings" in workers exposed to chromite dust. NIOSH further explains "The lungs of groups of workers exposed to chromite dust have been shown to be the seat of pneumoconiotic changes consisting of slight thickening of interstitial tissue and interalveolar septa, with histologic fibrosis and hyalinization."[24] These attributes are wholly consistent with the mixed dust pneumoconiosis suffered by Stanley Cole.

However, neither Dr. Haber nor the NIOSH guideline reveals any details about these "reports" of workers. There is no information about the circumstances of these workers or their exposure and dose levels to make any proper comparison to Cole and support a causation conclusion. There is also no evidence that the NIOSH "reports" are reliable studies as Cole and Dr. Haber seem to intimate.

Contrary to Cole's assertion, there are no "significant worker population studies" that can support a reliable causation opinion.

Having reviewed Cole's evidence, we conclude that Cole's experts' opinions do not establish reliable exposure or dose levels for Cole, do not show that any asserted exposure or dose levels for Cole were comparable to or greater than those experienced by subjects in the cited studies, and do not demonstrate that Cole's circumstances are similar to those of the subjects in the studies in that the evidence did not show the subjects were exposed to olivine or its components. We find there is no scientifically reliable evidence to support Dr. Haber's and Parker's

---

[24] Dr. Haber neglected to mention that the NIOSH guideline also explained, with regard to the workers who developed a nodular type of pulmonary disease with impairment of pulmonary function, that "[t]his pulmonary problem may be one of hypersensitivity and thus reversible." Dr. Haber also did not mention that the NIOSH guideline stated that only four workers developed a nodular type of pulmonary disease, although there is no information about how many workers in total engaged in the same work and had the same exposure or dose level as the four who developed the disease.

proffered opinions and, thus, make the required showing with regard to specific causation. *See Bostic*, 439 S.W.3d at 351; *Havner*, 953 S.W.2d at 715, 720. The trial court did not abuse its discretion in (1) concluding that Dr. Haber's and Parker's expert opinions are unreliable, (2) sustaining Exxon's objections to Cole's expert causation testimony, and (3) excluding the experts' testimony. Accordingly, we overrule Cole's fourth issue.

### D.    Summary Judgment

In his third issue, Cole argues the trial court erred in granting summary judgment because his "mixed dust pneumoconiosis is an occupational lung disease recognized by Texas courts." In that regard, Cole claims that a federal case and an OSHA publication cautioned that use of non-silica abrasive agents like olivine "may have other adverse health effects," "can result in elevated levels of other hazardous air contaminants such as heavy metals," and "can create high concentrations of dust which contain toxic contaminants." *See In re Silica Prods. Liab. Litig.*, 398 F. Supp.2d 563 (S.D. Tex. 2005); OSHA, *Abrasive Blasting Hazards in Shipyard Employment* (2006). Citing a case from our sister court, Cole further states that "[m]ixed dust pneumoconiosis is also known to Texas Courts. 'As of 1992, mixed dust pneumoconiosis is a recognized occupational disease just as silicosis, asbestosis, and berylliosis are recognized occupational diseases.'" *See U.S. Fire Ins. Co. v. Ramos*, 863 S.W. 2d 534, 539 (Tex. App.—El Paso 1993, writ denied).

However, recognition by Texas courts that mixed dust pneumoconiosis is an occupational lung disease or that exposure to olivine (or its components) can result in mixed dust pneumoconiosis does not absolve Cole from presenting reliable expert causation evidence that his exposure to olivine caused his disease in this case. Cole alleged that his mixed dust pneumoconiosis was caused by exposure to

40

olivine dust when he worked as a blaster at Exxon's facility. The existence of a causal connection between exposure to a certain substance, here olivine, and disease requires specialized expert knowledge and testimony because such matters are not within the common knowledge of lay persons. *See Abraham*, 233 S.W.3d at 18. As we explained in detail, the testimony of Cole's experts Dr. Haber and Parker does not constitute reliable causation evidence and Cole presented no other reliable expert evidence to support the causation element of his asserted claims. Therefore, the trial court did not err in granting Exxon summary judgment. *See* Tex. R. Civ. P. 166a.

Accordingly, we overrule Cole's third issue.

## CONCLUSION

Having overruled all of Cole's arguments, we affirm the trial court's judgment.

/s/      Meagan Hassan
Justice

Panel consists of Justices Hassan, Poissant, and Wilson. (Poissant, J., dissenting opinion to follow).

41